## Osee W. Webster and another v. Alfred Bailey.

*Equity pleading and practice : Death of complainant : Revival of suit : Amendments : Surplusage.* Where an order has been made under the statute for the revival of a chancery suit in the names of the administrator and heirs, upon the death of the complainant, the filing of amendments to the bill, consisting of statements of the complainant's death and the devolution of her estate and averments that the defendant withholds from them their rights, with a prayer for relief corresponding to the original prayer, though unnecessary, does not prejudice the defendant, and such amendments may be disregarded as surplusage.

*False representations : Scienter : Fraud.* Representations by the vendor of a mortgage given. by a third person upon lands at a distance, as to the responsibility of the mortgagor and the value of the securities, which are false in fact, though honestly made in the belief that they were true, if they are relied upon and mislead the purchaser, are tantamount in legal effect to fraud.

*False representations : Judgment of the vendor : Caveat emptor : Suggestion to purchaser to examine for himself : Deceit.* A suggestion, during the negotiation for such purchase, and coupled with such representations, that the proposed purchaser go himself and look at the land, as their judgments might not agree, and if not satisfied with the land the vendor would pay his expenses, but if satisfied the purchaser should pay them himself, impliedly asserts that he had himself exercised an intelligent judgment, and in the absence of any intimation of any possible doubt of the facts being as represented, would be likely to dissuade the purchaser from going, and to confirm his belief in the representations ; and it could not operate, under such circumstances, to shield the vendor from the consequences of his misrepresentations.

*Heard October 29. Decided January 6.*

Appeal in Chancery from Lenawee Circuit.

*C. A. & S. C. Stacy* and *William A. Underwood*, for complainants.

*A. L. Millard*, for defendant.

CAMPBELL, J.

The bill in this case was filed by Clarinda L. Webster, now deceased, to rescind the sale of certain mill property which was sold by her, through her husband's agency, to Bailey, the defendant, in exchange for a mortgage given by one Davis to one Freeman, on property in Saginaw county, for two thousand five hundred dollars, and assigned by

Freeman to Bailey in exchange for a stock of boots and shoes.    The bill claims that complainant was deceived by the statements of Bailey concerning the value of the security.

After Mrs. Webster's death an order was made under the statute for the revival of the suit, in the names of the administrator and heir.    A paper was then filed containing amendments to the bill, which consisted in a statement of Mrs. Webster's death and the devolution of her estate, and averments that defendant withholds from them their rights, and a prayer for relief, corresponding to the original prayer, except that it is in favor of the new parties.

It is objected that these amendments were improper, because introducing matters which have occurred since the bill was filed.

They are, in fact, the substance of what would be inserted in a bill of revivor; and, this being so, they are neither more nor less than what was already implied by the order of revival; which, by dispensing with the necessity of a bill, compels the court to read the record in favor of the new parties, as if all essential to such a bill was before it in another form.

These amendments introduced no new facts upon the merits, and were entirely unnecessary.    They are of no consequence, and should be disregarded.    They can do no possible harm to the defendant, who has taken no steps to get rid of them, and is no worse off with than without them.

The controversy chiefly turns on the point whether defendant's course in obtaining the property of Mrs. Webster was such as to entitle her to complain of the worthlessness of the security which she took in exchange for it, or whether she took this entirely at her own risk.

The whole bargain was made with her husband, and it is not disputed that she is in the same position as if she had conducted the business in person.

The belief on which the husband took the mortgage and accompanying notes, which were not then due, was, that

the mortgagor was thoroughly responsible, and the land mortgaged ample security, and that defendant had taken the mortgage from the mortgagee at its face for full value, and had taken adequate means to assure himself of the goodness and adequacy of all the securities. Upon this there is no room for doubt.

We are also satisfied from the testimony, that the mortgagor was not responsible, nor the land good security, and that Freeman knew this, or had abundant reason to know it. But we are not satisfied that defendant knew this when he took the assignment, and we are also inclined to the belief that he gave what was full value, and was himself defrauded.

It is apparent, however, that he did not take this without deliberation and personal observation,—that he went to the place where the land was, and made inquiry where he chose to inquire, and examined so much of the land as he thought necessary, and did not take the assignment until he had thus inquired and examined, although he was probably misled. This becomes very material, in considering what the probabilities are, under the conflict of testimony upon the nature and extent of his representations. Complainants' case is fully made out if we accept the testimony of Osee Webster. That on the part of the defendant represents the transactions attending the bargain with Webster differently. But some facts are plain and not open to difference.

Defendant had sold out his entire stock of boots and shoes, and had taken these notes and the mortgage as absolute payment for about one-half of the price. This was in June, 1870. In August, 1870, he began to negotiate through one James Potter, who received from Osee Webster an offer to sell the mill property of complainant for $2,500. Potter informed Webster that defendant had the notes and mortgage in question, which he wanted to use in the purchase, and it was understood between them that if a bargain were made they should be used.

There is a difference between Webster and Potter as to what representations Potter made. Webster's statement is, that $500 was to be paid down, and repaid to Bailey when the notes and mortgage were paid; and that Potter represented that Bailey had seen the land, and told him (Potter) that he would not have taken the securities if they had not been good; that Bailey said the land was good, and the maker of the mortgage was good, and in the hoop business, and worth about $5,000, and expected money from the east to pay this obligation with. Potter does not remember about the money down, and states what he said, as being, that Bailey said Freeman told him about the value of the land and Davis's responsibility. He makes no allusion to Bailey's having gone to see the land, and does not attempt to detail all that passed. Both he and Webster substantially agree that he told Webster Bailey said if Webster would go and look at the land and satisfy himself, and if they did not trade Bailey would pay his expenses, but if they traded he should pay his own expenses. Both agree that it was the land that was to be looked at, and no reference was made in this offer to the personal responsibility of Davis. Webster said he had not money and was not able to do it, but said he would trade if the papers were good. Potter says he said he would trade, but does not remember what he said in answer to the proposal to examine.

Mr. Potter does not detail his own previous instructions from Bailey; neither does Mr. Bailey. Both devote more time to the recital of what took place at the final interview with Bailey. But there is no doubt that the terms of the sale were all agreed on before this between Potter and Webster, though the agreement itself was not then made.

Bailey and Potter came over soon afterwards, and the agreement was fixed upon and a day appointed for having the papers passed. A fact of some importance appears, that during all this time the papers were not produced, and were in the hands of a third person, apparently as col-

lateral security, and were released on the day before the papers were exchanged. It does not appear that any description was given to Webster of the land at any time before the papers were signed. As the interview with Bailey is chiefly discussed, it becomes necessary to consider the facts in the record bearing on it.

As Webster relates it, Bailey's representations were distinct upon the property and the responsibility of the mortgagor. He says Bailey said they had come to complete the bargain, and on referring to what had taken place with Potter, Webster said he had told Potter if the papers were good and would be paid without trouble he would take them. Whereupon Bailey said they were good, and made the further statements referred to. That Bailey agreed to pay down five hundred dollars, to be repaid out of the mortgage. Webster further states that a day was fixed for exchanging the papers at Tecumseh, when Bailey excused himself for not having been able to collect the money for the cash payment, and upon further assurances the trade was closed by accepting the mortgage without any sum down.

Bailey admits in his answer he said he would make a payment down if he should receive some money which he expected, but did not positively promise any, but that he did excuse himself at the final meeting, and said Webster need not feel under any obligation to trade unless he chose to. Upon this Webster's statement seems corroborated by the answer, as there would have been no reason for throwing up the bargain if the cash payment had not been one of the terms agreed on. In his testimony Bailey states the offer to give up the bargain a little differently, as if he himself was not anxious to conclude it, which was evidently not true; and if the suggestion was made as he there puts it, there would be room for a stronger inference of a directly fraudulent intent in stimulating Webster to a sale than appears elsewhere.

As to the representations made by Bailey concerning

the mortgage, he recites a long conversation, giving a minute account of all that took place when he took the securities, detailing his visit to Freeman and Davis, and his imperfect examination of a part of the land mortgaged. He states, among other things, that after giving this recital, and insisting the papers must be taken at Webster's risk, he renewed the proposition that Webster should go and see for himself, to have his expenses paid if he did not trade, but to bear them if he did. In this the answer and Bailey's and Potter's testimony substantially agree. The reason given was, that Bailey did not want Webster to take his judgment, for their judgments might not agree. The answer of Bailey does not state what Webster replied to this, but says they completed the trade. Bailey's testimony is, "He said to me, if you have seen it, I don't care to go. I said very well. Then we will appoint a day when you will meet me at Tecumseh and we will exchange papers." With this, Potter's statement agrees in substance.

There is much more testimony which may have some bearing, and a good deal of it refers to subsequent conduct of Bailey's which may, perhaps, by itself be susceptible of different constructions, according to the view taken of the previous dealings. Upon a careful review of the facts, we do not think the testimony as conflicting as was claimed. on the argument. It is, we think, quite evident that Webster was led to believe that Bailey had taken sufficient measures to assure himself that the mortgage was good, and Davis responsible. From the defendant's own testimony it is impossible to believe that the suggestion that Webster should go and look at the land was put to him in such a way as to make him suppose it was at all important; while the penalty in case he was satisfied with the land, was calculated to dissuade him from going, and to confirm him in the belief it would be useless. There is no pretense that his attention was called to any possible doubt of Freeman's veracity or Davis's solvency, and the matter was narrowed down to a question of judgment.

Webster did not care to look at the land if Bailey had seen it and was satisfied, and Bailey only suggested their judgments might differ, impliedly asserting he had exercised an intelligent judgment.

Such a final disposal of the matter makes it evident that however guarded Bailey may have been, or may suppose himself to have been, in his language, Webster was not led to believe he ran any risks, except in the single matter of Bailey's knowledge of land. His whole testimony is consistent with this, and such a proposition as Bailey mentions would be almost trifling on either theory. If Webster is accurate, it might easily have passed unnoticed or unremembered, as a proposition of no importance whatever. If Bailey's narrative is correct, and the proposition was serious, it would inevitably tend to assure Webster that there was nothing else in doubt, and if so, this was not worth considering.

The only charitable view we can take of the case, and we are disposed to believe it the true one, is, that Bailey thought he had good securities, and so represented them to Webster; and that while he may have given the history of them, he did not do so in such a manner as to give Webster to understand he was making any reservation or imposing any risk or responsibility on the party with whom he was dealing. It is impossible to account for Webster's conduct, or for much of Bailey's, except on that idea. The effect of the false impressions so created is in equity equivalent to that of fraud, whether designedly fraudulent or honestly mistaken.

We think the decree below was correct, and it must be affirmed, with costs. We have not overlooked the collateral questions, and think the conclusion of the circuit court as just as any we could deduce from the facts appearing in evidence on those matters.

The other Justices concurred.