Carlos Garza De LUNA, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 19037.

United States Court of Appeals
Fifth Circuit.

Aug. 15, 1962.

James R. Gillespie, San Antonio, Tex., for appellant.

Russell B. Wine, U. S. Atty., K. Key Hoffman, Asst. U. S. Atty., San Antonio, Tex., Ernest Morgan, U. S. Atty., Wayne F. Speck, Asst. U. S. Atty., for appellee.

Before BROWN, WISDOM, and BELL, Circuit Judges.

WISDOM, Circuit Judge.

■■ The conflicting interests of the two co-defendants in this action have generated a narrow but important question relating to the scope of the privilege against self-incrimination: When one of two defendants jointly tried in a criminal proceeding in a federal court exercises his right not to testify, does the Fifth Amendment protect him from prejudicial comments on his silence made to the jury by an attorney for the co-defendant? Pointing to the fact that the United States attorney was free from blame, the Government argues that the general rule against commenting on the exercise of the privilege is inapplicable to the facts of this case. We reject this contention. In a criminal trial in a federal court an accused has a constitutionally guaranteed right of silence free from prejudicial comments, even when they come only from a co-defendant's attorney. If an attorney's duty to his client should require him to draw the jury's attention to the possible inference of guilt from a co-defendant's silence, the trial judge's duty is to order that the defendants be tried separately.

I.

Carlos Garza de Luna and Adolfo Gomez, cousins, were charged jointly in a two-count indictment with receiving and facilitating the transportation and concealment of a narcotic drug and with purchasing and acquiring a narcotic drug in violation of the Narcotic Drug Import and Export Act. Each hired his own attorney. Each attorney defended his client as he saw best, without regard to the interests of the other defendant. Before trial Gomez moved for a severance. The motion was denied. At the

trial in San Antonio, Texas, de Luna, a Mexican national, did not take the stand. Gomez, a resident of San Antonio, took the stand and produced members of his family and other witnesses to testify in his behalf. He put all the blame on de Luna. According to Gomez, he was an innocent victim of circumstances; his only connection with the narcotics was when he and de Luna were riding in Gomez's automobile; de Luna saw the police coming, tossed a package (the narcotics) to him and told him to throw it out of the window. The police saw Gomez throw the package. De Luna's attorney argued that the man he represented was being made a scapegoat; that the police officers testified they had not seen de Luna toss the package to Gomez and had seen no movement in the car although they were alongside it; that the sole culprit was Gomez.

In accordance with his theory of the case and impelled by a proper sense of duty to his client, Gomez's attorney, in arguing to the jury, contrasted Gomez's willingness with de Luna's unwillingness to take the stand. He stated plainly that an honest man is not afraid to take the stand and testify.[1] He said:

1. Mr. Semaan, attorney for Gomez, argued:
"I had to bring out certain evidence in this case against Carlos Garza De Luna. * * * I did that because I owe a duty to the man I represent. ¶ In connection with that, I want to tell you there is a difference between these two men. We know a little something about Adolfo Gomez. We knew that for fifteen or twenty years, more or less, he has worked day after day at hard labor. I don't know what this man does for a living. *He could have gotten up and told you —.*" R. 181 (Emphasis added).
Mr. Gillespie, de Luna's attorney, objected:
"He's alluding to the fact that the defendant DeLuna did not testify, and the Court's instructions specifically orders the jury not to question the fact that the defendant DeLuna did not take the witness stand. And we think it's highly prejudicial and inflammatory to his rights." R. 181.
The following colloquy then took place:
"THE COURT: I don't think he made an allusion that the defendant didn't testify.
"MR. GILLESPIE: He just said it, Your Honor.
"THE COURT: Did you say it?
"MR. SEMAAN: I said this, Your Honor, that we know what the defendant Gomez does for a living; he testified and told you; but I don't know what the other man does.
"THE COURT: That's what I thought. I don't think he made an allusion to his failure to testify.
"MR. SEMAAN: Now, further, Adolfo Gomez has given you his version of the facts in this case. He has told you how the narcotics came into his possession, if it came into his possession, as 'posses-

sion' is defined in the charge. That fleeting instant when it was tossed to him and he tossed it out. *I haven't heard anyone deny that.*
"MR. GILLESPIE: Your Honor, again he is putting me in the position of having to object on the same grounds. He is again alluding to the fact that the defendant DeLuna did not testify, and I'm objecting to it as prejudicial and inflammatory. He knows the Court's charge to the jury in this matter is—
"THE COURT: *Now, I think that was an allusion to the defendant's failure to testify.*
"MR. SEMAAN: May I approach, Your Honor?
(Thereupon counsel conferred with the Court out of the hearing of the Reporter.)
"MR. GILLESPIE: What will be the Court's ruling on the objection, Your Honor?
"THE COURT: I'll overrule the objection.
"MR. GILLESPIE: Note our exception.
"MR. SEMAAN: *Well, at least one man was honest enough and had courage enough to take the stand and subject himself to cross examination, and tell you the whole story,* and tell you that, 'Yes, I first colored the story, but when I got back to my senses I told the truth, and that's the whole thing.' ¶ *You haven't heard a word from this man* [de Luna].
"MR. GILLESPIE: Your Honor, I'm going to object again, on the same ground as before, that this argument is inflammatory and prejudicial and it will make it a paradox when you have it in the Court's charge that the jury cannot regard the fact that this man did not testify.

"Well, at least one man was honest enough and had courage enough to take the stand and subject himself to cross examination and tell you the whole story, and tell you that, 'Yes, I first colored the story, but when I got back to my senses I told the truth, and that's the whole thing.' ¶ You haven't heard a word from this man [de Luna]."

This comment followed on the heels of somewhat similar comment to which de Luna's attorney had objected strenuously as "inflammatory and prejudicial". These were not casual or isolated references; they were integral to Gomez's defense. And considering the case from Gomez's point of view, his attorneys should be free to draw all rational inferences from the failure of a co-defendant to testify, just as an attorney is free to comment on the effect of any interested party's failure to produce material evidence in his possession or to call witnesses who have knowledge of pertinent facts. Gomez has rights as well as de Luna, and they should be no less than if he were prosecuted singly. His right to confrontation allows him to invoke every inference from de Luna's absence from the stand.

The joint trial, the fact situation, and Gomez's defense placed the trial judge in a dilemma. At the time of the prejudicial remarks and again in his formal charge, he instructed the jury to disregard the fact that de Luna did not testify.[2] Yet, in justice to Gomez, the trial judge owed and gave the following instruction:

"The defendant Adolfo O. Gomez has taken the stand and testified in his own behalf in this case. A defendant cannot, in a criminal case, be compelled to take the witness stand and to testify. Whether he testifies or does not testify is a matter of his own choosing.

"When, however, a defendant elects to take the witness stand and testify, then you have no right to disregard his testimony because he is accused of a crime. When a defendant does testify, he at once becomes the same as any other witness, and his credibility is to be tested by and subjected to the same tests as are legally applied to any other witness."

No objection can be taken to such instructions in the ordinary case. None can be taken in this case, as far as justice to Gomez is concerned. But here, on top of comments prejudicial to de Luna, such instructions led the jury in the very direction to which the comments of Gomez's attorney pointed.

Thus, the joint trial of the two defendants put Justice to the task of simultaneously facing in opposite directions. And Justice is not Janus-faced.

"THE COURT: The jury cannot, under the Court's charge, consider or refer to the fact that DeLuna did not testify in passing on the question of his guilt or his innocence. However, we have two defendants here. This is an argument between the defendants; the District Attorney has not made any allusion to that. But I still tell you you cannot consider that as bearing on the question of the guilt or innocence of the defendant De-Luna.

"MR. GILLESPIE: Your Honor, I don't think the Court's admonition to the jury can clear their prejudice, and I am going to move for a mistrial on behalf of the defendant DeLuna.

"THE COURT: Overruled." R. 182–184 (Emphasis added).

2. The district judge charged the jury:
"The defendant Carlos Garza De Luna has not testified in this case. You are instructed that under the law a defendant in a criminal case may take the stand and testify in his own behalf if he chooses, but the defendant is not required to testify, and you are charged that the failure of the defendant to take the stand in his own behalf in this case will not be considered by you as any evidence at all of his guilt as to the charge contained in the indictment in this case, and in your retirement you will not consider or refer to the fact that the defendant did not testify. R. 209."

The jury found Gomez not guilty on both counts of the indictment, de Luna guilty on both counts. The district judge imposed a sentence of seven years.

## II.

The history [3] of the development of the right of silence is a history of accretions, not of an avulsion.[4] The privilege against self-incrimination, even as a limited privilege, is not found in Magna Carta,[5] the Petition of Right, the Bill of Rights of 1689, or other basic English sources of our liberties.[6] The first major constitutional document in which it appeared was the Virginia Bill of Rights in 1776. Yet, from obscure beginnings and subject to eroding currents it has developed into what Dean Griswold has described as "one of the great landmarks in man's struggle to make himself civilized." [7]

The privilege has never lacked for critics—many of them distinguished jurists and legal scholars. They say, "If we assume the continuance of trial by an impartial jury before a competent judge in public, it is difficult to understand how an accused represented by competent counsel can be unfairly treat-

3. Legal scholars have exhaustively explored the history of the privilege. For references to the works of Stephens, Stubbs, scholars, see Wigmore on Evidence, § Pollock, Maitland and the continental 2250, fn. 1 (1940). Wigmore's account of the privilege, based on his research around the turn of the century [5 Harv.L.Rev. 71 (1891) ; 15 Harv.L.Rev. 610 (1902)], is incorporated in Chapter 80, Wigmore on Evidence. It is now somewhat dated. The third edition of Wigmore on Evidence, Chapter 80, § 2250 (1940) cites and takes into account the work of Holdsworth, Corwin, Pittman, and Mary Hume Maguire. In the 1961 edition Professor McNaughton made substantial revisions of Chapter 80, but left intact Wigmore's history of the privilege, except to point up certain significant divergencies between Wigmore's conclusions and those of later writers. For more recent short historical summaries see McCormick on Evidence, Sec. 120 (1954) ; Rogge, The First and the Fifth Amendments, Chapter X. (1960), and Taylor, Grand Inquest, Chapter 7 (1955). A number of valuable writings have been published in recent years on the history and policy of the privilege. See especially: McNaughton, Privilege Against Self-Incrimination, 51 J.Crim. L., C. & P. S. 138 (1960) ; Mayers, The Federal Witness' Privilege Against Self Incrimination: Constitutional or Common Law? 4 Amer. J.Legal Hist. 107 (1960); Mayers, Shall We Amend the Fifth Amendment? (1959) ; Silving, The Oath, 68 Yale L.J. 1329, 1527 (1959); Kemp, The Background of the Fifth Amendment in English Law: A Study of Its Historical Implications, 1 Wil. & Mary L.Rev. 247 (1958); Pittman, The Fifth Amendment: Yesterday, Today, and Tomorrow, 42 Am.Bar Ass'n J. 509 (1956); Griswold, The Fifth Amend-

ment Today (1955); Franklin, The Encyclopédiste Origin and Meaning of the Fifth Amendment, 15 Law. Guild Rev. 41 (1955); Williams, Problems of the Fifth Amendment, 24 Ford.L.Rev. 19 (1955), A Reappraisal of the Immunity from Self-Incrimination, 39 Minn.L.Rev. 75 (1954); Meltzer, Required Records, the McCarran Act and the Privilege Against Self-Incrimination, 18 U. of Chi. L.Rev. 687 (1951); Morgan, The Privilege Against Self-Incrimination, 34 Minn. L.Rev. 1 (1949).

4. "[E]xcept for the narrow proscription of compulsory sworn testimony from an accused in a criminal proceeding directed at him, the privilege has become a constitutional doctrine only piece by piece and relatively recently. And in the process, the constitutional privilege has incorporated and exceeded the common law privilege against self-incrimination." McNaughton, Privilege Against Self-Incrimination, 51 J.Crim.L., C & P.S. 138, 141 (1960). See also Corwin, The Supreme Court's Construction of the Self-Incrimination Clause, 29 Mich.L.Rev. 191–96 (1930). Cf. Franklin, The Encyclopédiste Origin and Meaning of the Fifth Amendment, 15 Law.Guild Rev. 41 (1955).

5. Unless it can be said that the germ of the privilege appears in the thirty-eighth clause of Magna Carta: "No bailiff upon his own bare word without credible witnesses is to send a man to trial."

6. The Scots Claim of Rights of 1689 does provide, "That the forcing of lieges to depose against themselves in capital crimes, however the punishment be restricted, is contrary to law."

7. Griswold, the Fifth Amendment Today (1955), p. 7.

ed by being required to testify." [8] The classic attack on the policy of the privilege was made by Jeremy Bentham: "Only the guilty profit from the exclusion [the privilege]." [9] No less a judge than Justice Cardozo, in a passage often quoted, said: "Justice * * * would not perish if the accused were subject to a duty to respond to orderly inquiry". [10] Professor Wigmore was consistently unfriendly to the privilege, especially to its recognition when there was no direct coercion by the Government and when there was no formal charge to which the unanswered ques-

tions relate; his writings are an inexhaustible quarry of quotations apt for use against the policy of the privilege. [11] More often than not, the attack on the privilege has been oblique, directed at limiting its scope or undermining its effect by permitting judge and prosecutor to comment on a defendant's exercise of the privilege and permitting the fact-trier to draw all reasonable inferences. [12] Criticism of the privilege can be supported by excursions into history to show that the privilege is not what it used to be; [13] that, historically, it could not be

8. Comment on Rule 201, Model Code of Evidence, American Law Institute (1942). Professor Wigmore was the Chief Consultant; Professor Morgan was The Reporter; the Advisory Committee on Evidence included Judge Learned Hand, Judge Augustus Hand, Professor Maguire, and Professor McCormick. See footnote 12.

9. Bentham, Rationale of Judicial Evidence (1827), 7 The Works of Jeremy Bentham, 446–66 (1843). It is sometimes overlooked, however, that Bentham proposed only that the defendant be subject to interrogation, with his silence open to inference, and not that he be compelled to answer.

10. Palko v. Connecticut, 1937, 302 U.S. 319, 326, 58 S.Ct. 149, 82 L.Ed. 288.

11. For example: "It had a use once. Has it a use now? There was a demand for it three centuries ago, as a safeguard against an extraordinary kind of oppression, which like witchcraft, has passed away forever. Is there a demand now? I think that the history of the privilege shows that in deciding these questions we may discord any sanction which its age would naturally carry. As a bequest of the seventeenth century, it is but a relic of controveries and dangers which have disappeared. As a rule of canon law it never was accepted as we accept it * * *. As to its intrinsic merits, then may we not express the general opinion in this way, that the privilege is not needed by the innocent and that the only question can be how far the guilty are entitled to it." Wigmore, Nemo Tenetur Seipsum Prodere, 5 Harv.L.Rev. 71, 85 (1891).
   Perhaps Fairman's answer may be the best: "If this is only a problem in the law of evidence, that is one thing. The

great name of Wigmore will be invoked against some of the exclusionary principles laid down by the Supreme Court. The law of evidence is concerned primarily with workable rules for determining truth. * * * [But the Supreme Court] does not sit to enforce Wigmore on Evidence. * * * [I]n asserting the voice of the Constitution the Court rises far above the mere law of evidence." Fairman, Fundamental Law in Criminal Prosecutions (1959), p. 71.

12. In 1931, 1934, and 1938 the American Bar Association adopted resolutions recommending the abrogation of the statutes prohibiting comment. 56 A.B.A.Rep. 137–59 (1931); 59 A.B.A.Rep. 130–41 (1934). The American Law Institute by a vote of 91 to 53 adopted a similar ressolution in 1931. 9 Proc. A.L.I. 202, 203 (1931). Rule 201(3) of the Model Code of Evidence, American Law Institute (1942) reads: "If an accused in a criminal action does not testify, the judge and counsel may comment upon accused's failure to testify, and the trier of fact may draw all reasonable inferences therefrom". This rule, however, was favored by only three of the Advisors and by neither of the two Reporters. See footnote 8. Rule 23(4) of the Uniform Rules of Evidence, National Conference of Commissioners on Uniform State Laws (1953) is identical except that it allows "counsel" instead of "the judge and counsel" to comment.

13. For example: "(1) [T]he rule was developed to prevent the employment of legal process to extract from the person's own lips an admission of his guilt." 4 Wigmore, Evidence (2d. Ed. 1923) 809. ¶ (2) "Analysis of this historical foundation indicates that the abuses which made the privilege necessary were legal methods of physical compulsion, not infer-

asserted by one formerly accused or one not coerced directly by the State.[14] But the critics, "in their over-emphasis on the history of the Fifth Amendment privilege overlook the fact that a noble principle often transcends its origins, that creative misunderstandings account for some of our most cherished values and institutions; such a misunderstanding may be the mother of invention." [15]

It may be historically true, and Professor Wigmore documents it, that in the first few hundred years of its growth

the resistance to the oath *ex officio* as compulsory self-accusation represented mainly a jurisdictional struggle between State and Church, and between common law courts and ecclesiastical courts; it was "not to protect from answers in the king's court of justice". But the struggle against the *inquisitio* and oath *ex officio* on the ground that a man is entitled to be formally accused eventually transcended the jurisdictional questions.[16] It may be that Sir Edward Coke, the first to use the maxim, *nemo*

ences and presumptions created by passive operation of law." Note, 25 Va.L. Rev. 90 (1938). ¶ (3) "All that was in the minds of the framers of the Constitutional provisions was the desire to prevent injustice and direct compulsion. Theirs was a protest against and a fear of the inquisition of torture which was even then so prevalent on the Continent of Europe and which, though denied, has so often accompanied the proceedings of the Star Chamber." Bruce, The Right to Comment on the Failure of the Defendant to Testify, 31 Mich. 226, 233 (1932). ¶ (4) "It is entirely in accord with justice and the constitutional guarantee to hold that the latter prohibits the use of force or mental torture to draw testimony from even a guilty defendant. But to go to the extent of maintaining that the Constitution is so literally all inclusive as to prohibit the drawing of an inference from his silence is to impute to our forefathers a love of criminals that this writer refuses to believe that they had." Swope, Comment, 37 Mich.L.Rev. 777, 782 (1939).

14. In State v. Baker, 115 Vt. 94, 53 A. 2d 53 (1947) the Vermont Supreme Court upheld a statute authorizing the State's attorney to comment upon and the jury to draw inferences from the accused's failure to testify in the face of a constitutional privilege against self-incrimination. Relying upon the historical derivation of the privilege, the court concluded that it was intended to restrain compulsion of a direct and physical nature rather than indirect pressure within the courtroom. For parallel conclusions see Justice Lummus dissenting in In re Opinion of the Justices, 300 Mass. 620, 630, 15 N.E.2d 662, 667 (1938).

15. Frank J., dissenting in United States v. Grunewald, 2 Cir., 1956, 233 F.2d 556, 581, rev'd, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957).

16. In *inquisitio* the inquisitor examined a suspect under oath without prior charge but acting on common report (*per famam*) or notorious suspicion, a safeguard frequently disregarded in heresy and treason trials. The oath *ex officio* was a characteristic of the ecclesiastical courts. An accused taking the oath was required to answer truthfully all questions put to him on any subject however incriminating. Professor Morgan points out: "No doubt there was some confusion between the attack on the spiritual courts even to entertain certain causes and its power to institute proceedings by the *ex officio* oath. But there can equally be no doubt that to the common lawyers a system which required a person to furnish his own indictment from his own lips under oath was repugnant to the law of the land." Morgan, The Privilege Against Self-Incrimination, 34 Minn. L.Rev. 1, 9 (1949). Mrs. Maguire writes: "Careful study of the sources has forced me to believe that [Wigmore's] conclusion should be modified. Jealousy of jurisdiction is evident all through these centuries [through the sixteenth], it is true, but there is shown also steady and growing opposition to the administration of the oath itself as repugnant to the ancient customs of our Realm and contrary to the spirit of the common law." Maguire, Attack of the Common Lawyers on the Oath *Ex Officio* as Administered in the Ecclesiastical Courts in England, Essays in History and Political Theory in Honor of Charles Howard McIlwain (1936), p. 204. Kemp, citing Maguire, contends that the oath *ex officio* common in English law during the sixteenth century was not similar to the oath used in ecclesiastical courts from the thirteenth to the fifteenth century which demanded formal presentment. The true meaning of the oath *ex officio* was that the judge had the right to demand a sworn answer merely by virtue of his

*tenetur prodere seipsum,*[17] objected to the oath, not because of his interest in protecting the individual against the state, but because he objected to the intrusion of the clergy into the field of criminal law; the Court of High Commission and the Court of Star Chamber had no business putting an accused to the oath except in cases concerning marriages and wills. Nevertheless, the association of the prerogative courts with heresy and treason (crimes having to do with the individual's beliefs), the association of the Star Chamber with the rack, the opposition to the oath from Lollards, Puritans, Levellers, and other non-comformists led directly to the abolition of the High Commission and the Star Chamber, the prohibition of the oath,[18] and the ultimate triumph of the

office and without justified suspicion of guilt. Kemp, The Background of the Fifth Amendment in English law, 1 Wil. & Mary L.Rev. 247 (1958).

17. Wigmore translates the whole maxim, *"Licet nemo tenetur seipsum prodere, tamen proditus per famam tenetur seipsum ostendere utrum posset suam innocentiam ostendere et seipsum purgare"* this way: "Though no one is bound to become his own accuser, yet when once a man has been accused (pointed at as guilty) by general report, he is bound to show whether he can prove his innocence and to vindicate himself." "The whole maxim, far from establishing a privilege of refusing to answer expressly declares that answers must be given, under certain conditions (which are always fulfilled in our courts of justice)." Wigmore. Nemo Tenetur Seipsum Prodere, 5 Harv.L.Rev. 71, 84. According to Wigmore, the first person to use the four words, *nemo tenetur seipsum prodere,* was Coke in Cullier v. Cullier, Cro.Eliz. 201 (1589). Coke there argued that his client could not be forced to take the oath, because *nemo tenetur prodere seipsum.* "He gave forth an erroneous interpretation of [historical sources], which a sincere man can hardly be imagined as making; he misquoted * * *; and now he is found employing in his argument a partial and misleading statement of this rule of ecclesiastical practice. However this may be, it is certain * * * that the maxim as it is in use today was, in its origin, the broken half of a rule of quite the contrary "import" * * *. The maxim, or rather the abuse of it in the ecclesiastical courts helps explain the shape which the general privilege has now taken." 5 Harv.L.Rev. 71, 84. The true meaning then and before, going back to thirteenth century papal decretals, was that no man is bound to come forward in the *first place* with evidence against himself; that is, no man can be required to be his own *first accuser.* In time the meaning of *accusare* was given for *prodere;* the rule against providing the *first* evidence became a privilege that no man could be required to testify against himself *at all.* Silving points out that in Wigmore's translation "the decisive 'licet' is omitted and 'ostendere' is erroneously translated as 'prove'. The following translation comes closer to the original: 'No one is bound to inform against himself (literally, produce himself); but, when exposed by public repute *(fama),* he is held *(tenetur)* and permitted *(licet)* to show, if he can, his innocence and purge himself.' 'Notice that there is no mention in the maxim of a confession or admission. * * * Significantly, even within the system of inquisitorial procedure at canon law no one was ever required to inform against himself—*"prodere seipsum".* That procedure merely demanded of the *proditus* (accused) that he confess'. Wigmore's version of the maxim would be but a restatement of the inquisitorial rule, except that he did mention confession—the very object of inquisition. In the absence of any reference to confession and in the light of the emphasis placed upon the 'showing of innocence', the meaning of the maxim is plain: it grants to the suspect exemption from the oath *de veritate dicenda* [to tell the truth] and confers upon him the right and duty of purging himself conclusively by taking the ancient Germano-canonic 'oath of purgation.' " Silving. The Oath, 68 Yale L.J. 1329. 1367, 1526 (1959). See also Morgan, The Privilege Against Self-Incrimination, 34 Minn.L.Rev. 1, 8–11 (1949).

18. The Act of 1641 expressly prohibited ecclesiastical courts from requiring any person "to confess or to accuse himself or herself of any crime, offence, delinquency or misdemeanor, or any neglect, matter or thing, whereby or by reason whereof he or she may be liable or exposed to any censure, pain, penalty or punishment whatsoever". 16 Car. 1, c. 11, § 4. When the jurisdiction of the ecclesiastical courts except for the Court

accusatorial system, all in the general direction of the freedom to speak and the freedom not to speak. It may be that John Lilbourne did not object to answering questions relating to the specific charges against him; he objected to being questioned as to offenses with which he was not charged. "Seeing", he said, "the things for which I am imprisoned cannot be proved against me, you will get other matter out of my examination." [19] Yet, so it has been said, "it seems quite clear that we owe the privilege today primarily to Freeborn John Lilbourne." [20] The Long Parliament that did away with the High Commission and the Star Chamber and that forbade ecclesiastical courts to administer the oath *ex officio* or any oath requiring a person to accuse himself of crime, set aside Lilbourne's conviction, "as illegal, and most unjust, against the liberty of the subject, and law of the land, and Magna Carta, and unfit to continue upon the record."

By the middle of the seventeenth century the privilege against being ques-

tioned *until accused* had become firmly embedded in the common law as a broad right to remain silent whenever an answer might incriminate. The right was recognized in civil as well as criminal proceedings, and applied to witnesses as well as to defendants. Carrying the right to its logical conclusion—although it now seems a reductio ad absurdum—for two hundred years a defendant in a criminal case was not permitted to testify. The importance of the privilege then shifted to potential defendants.

When the colonists first came to this country it was at a time when the Puritans strongly opposed the oath *ex officio*. They carried with them their spirit of nonconformity. They opposed the inquisitorial methods of the royal governors, as they had opposed the oppressive practices of the Crown and the Star Chamber.[21] The Puritans were not the only colonists who carried strong recollections of the struggle against compulsory self-accusation.[22] In 1776 the Virginia Declaration of Rights provided that a person could not "be compelled to

of High Commission was restored during the Restoration, these courts were expressly denied the use of the oath *ex officio* "or any other oath whereby * * * [a person] may be charged or compelled to confess or accuse, to purge him or herself any criminal matter or thing, whereby he or she may be liable to any censure or punishment." 13 Car. 2, c. 12, § 4.

19. 3 How. State Trials 1315, 1344–46, 1352–53 (1637–1645).

20. Griswold, The Fifth Amendment Today (1955) p. 3. McCormick writes: "Moreover, during all the period of agitation against the inquisitional oath of the ecclesiastical courts, down to the time of Lilburn's case, it was the unchallenged practice of the common law judges in criminal trials to question the accused and bully him to admit his guilt. It is true, he was not under oath, for he was then incompetent as a witness, but there was no thought that he could not be called on to incriminate himself. By 1641, as an aftermath of Lilburn's case, defendants began to claim and judges to be persuaded. that an accused on trial was not to be compelled to disclose his guilt. Here again by the early 1700s, the revolution was complete * * *.

The maxim which once meant that no man shall be questioned until he has been first accused comes to mean that no man shall ever be required to answer about his crimes." McCormick on Evidence (1954) § 120.

21. Article 45 of the Massachusetts Body of Liberties of 1641 reads, in part: "No man shall be faced by Torture to Confess any Crime against himselfe nor any other unlesse it be in some Capitall case where he is first fullie convicted by cleare and suffitient evidence to be guilty * * * yet not with such Tortures as be Barborous and inhumane". The Connecticut Code of 1642 has a similar provision. See Maguire, Attack of the Common Lawyers on the Oath Ex Officio as administered in the Ecclesiastical Courts in England, Essays in History and Political Theory in Honor of Charles Howard McIlwain (1936) Chap. vii; Pittman, The Colonial and Constitutional History of the Privilege Against Self-Incrimination in America, 21 Va.L.Rev. 763 (1935) ; Bradford, History of Plymouth Plantation, Mass.His.Soc.Coll.Ser. 4, Vol. III, 390.

22. As early as 1677, after Bacon's Rebellion in Virginia, the House of Bur-

give evidence against himself". By 1784 seven state constitutions banned self-incrimination.[23]

The framers of the Fifth Amendment chose language susceptible of a narrow reading: "No person * * * shall be compelled in any criminal case to be a witness against himself." This would seem to be limited to *witnesses* testifying in *criminal* proceedings only; Madison could hardly have had in mind an *accused* exercising the privilege against self-incrimination at a time when a defendant was incompetent to testify.[24] Our courts, however, have not stood for a narrow constitutional construction of the Fifth Amendment based on a literal reading of the language in the light of its historical origins. The privilege is not limited to witnesses.[25] It is not limited to criminal proceedings.[26] It is not limited to cases involving direct compulsion to testify.[27] The scope of its application includes a wide variety of situations that would have astonished the founding fathers.

gesses, admonishing Governor Berkeley who had dealt harshly with the rebels, declared that " * * * noe law can compell a man to sweare against himself in any matter wherein he is lyable to corporale punishment." 2 Henning, Laws of Virginia 422.

23. Maryland (1776), Massachusetts (1780), New Hampshire (1784), North Carolina (1776), Pennsylvania (1776), Vermont (1777), and Virginia (1776). In 1780 General Nathaniel Greene, presiding over the officers who interrogated Major André, extended the benefits of the privilege to André.

24. Historically, the worst abuses were those which took place in political and religious tribunals, not those which took place after indictment by a criminal court. "No one in 1780 could foresee that criminal defendants, almost a century later, would be given the right to testify." Lummus, J., dissenting in Opinion of Justices, 1938, 300 Mass. 620, 15 N.E.2d 662.

It is by no means clear that the language is intended to incorporate a witness's common law privilege against self-incrimination. In an early statement often quoted, Justice John Marshall referred to the witness's privilege as a "settled maxim of the law"; he made no reference to the Fifth Amendment. In re Willie, 25 Fed.Cas. 38, 39 (C.A.Va. 1807). See Mayers, The Federal Witness' Privilege against Self-Incrimination: Constitutional or Common Law? 4 Amer.J.Legal Hist. 107 (1960); Meltzer, Required Records, the McCarran Act, and the Privilege Against Self-Incrimination, 18 U.Chi.L.Rev. 687, 698 (1951).

25. The right of a witness not to give incriminating answers and the right of an accused not to take the stand must be distinguished, although both come within the protection of the Fifth Amendment. United States v. Housing Founda-

tion of America, 3 Cir., 1949, 176 F.2d 665.

26. Despite the restrictive language purporting to limit the protection to criminal cases, the Supreme Court has said that "The object was to insure that a person should not be compelled, when acting * * * in any investigation, to give testimony that might tend to show that he himself had committed a crime." Counselman v. Hitchcock, 1892, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110. In Counselman v. Hitchcock a grand jury investigation was said to be a criminal case. In later cases the court has not tried to extend the meaning of "criminal case"; it has flatly asserted that the privilege is not dependent on the nature of the proceeding. McCarthy v. Arndstein, 1922, 266 U.S. 34, 40, 45 S.Ct. 16, 69 L.Ed. 158. There is some evidence in the legislative history that the founding fathers had fears of the government's introducing the practice of torture in criminal cases, but Madison's version was presented in a section dealing generally with the rights of individuals. 3 Elliott's Debates, 447 (1876). See Corwin, The Supreme Court's Construction of the Self-Incrimination Clause, 29 Mich.L.Rev. 1, 196 (1930); Note, Applicability of Privilege Against Self-Incrimination to Legislative Investigations, 49 Col.L.Rev. 87, 91 (1949). Mayers, The Federal Witness' Privilege Against Self-Incrimination: Constitutional or Common Law, 4 Am.Journ.Leg. Hist. 107 (1960). No distinction as to the type of proceeding in which the privilege was applicable was recognized at common law.

27. See McKnight v. United States, 6 Cir., 1902, 115 F.2d 972, in which the accused, in the presence of the jury was directed by the court to produce a certain document. See cases collected in Annot., 110 A.L.R. 101 (1937).

The Supreme Court stands firmly for a broad view of the right. "To apply the privilege narrowly or begrudgingly—to treat it as an historical relic, at most merely to be tolerated—is to ignore its development and purpose".[28] "This constitutional protection must not be interpreted in a hostile or niggardly spirit."[29] The Fifth Amendment "must have a broad construction in favor of the right which it was intended to secure."[30]

Summarizing and of course greatly oversimplifying it, jurisdictional objections against overreaching by ecclesiastical courts and a resistance movement against oppressive inquisitorial practices which led to the great civil and religious reforms in the seventeenth and eighteenth centuries resulted in recognition of the privilege against self-incrimination by one not formally accused. This limited privilege against compulsory self-incrimination *until formally accused* has now developed into a broad right of silence, a freedom not to speak—complementing freedom of speech.[31] Because the right is the result of successive accretions, it is not as severely bounded by

historical origins, surveyed as of an early time, as are some legal institutions. It is more important to consider its *line of growth* as indicative of an expanding right capable of encompassing new and novel situations today as in the past.[32] If the expansion of the individual's right of silence comes at the expense of the power and efficiency of the State, that is but in accord with the nature of the right and its historical development. "[B]oth the safeguard of the Constitution and the common law rule spring alike from that sentiment of *personal self-respect, liberty, independence and dignity* which has inhabited the breast of English speaking peoples for centuries, and to save which they have always been ready to sacrifice any governmental facilities and conveniences."[33]

### III.

In the common law in England until 1898 and in this country until after the Civil War, the incompetency of an accused to testify made the effect of his silence a metaphysical question. It ceased to be metaphysical when statutes were enacted giving defendants the op-

28. Quinn v. United States, 1950, 349 U.S. 155, 162, 75 S.Ct. 668, 673, 99 L.Ed. 964, 972.

29. Ullman v. United States, 1955, 350 U.S. 422, 426, 76 S.Ct. 497, 100 L.Ed. 511.

30. Counselman v. Hitchcock, 1892, 142 U.S. 547, 562, 12 S.Ct. 195, 35 L.Ed. 1110.

31. "The guarantee against self-incrimination contained in the Fifth Amendment is not only a protection against conviction and prosecution but a safeguard of conscience and human dignity and freedom of expression as well. My view is that the Framers put it beyond the power of Congress to compel anyone to confess his crimes. The evil to be guarded against was partly self-accusation under legal compulsion. But that was only a part of the evil. The conscience and dignity of man were also involved. So too was his right to freedom of expression guaranteed by the First Amendment. The Framers, therefore, created *the federally protected right of silence* and decreed that the law could not be used to pry open one's lips and make him a

witness against himself." Justice Douglas, dissenting in Ullman v. United States, 1955, 350 U.S. 422, 76 S.Ct. 497, 100 L. Ed. 511, 528. (Emphasis supplied).

32. "For the history of the privilege establishes * * * that it is not to be interpreted literally." Ullman v. United States, 1955, 350 U.S. 442, 76 S.Ct. 497, 100 L.Ed. 511. "* * * the provisions of the Constitution are not mathematical formulas having their essence in form; they are organic living institutions transplanted from English soil. Their significance is vital not formal; it is to be gathered not simply by taking the words and a dictionary, but *by considering their origin and the line of their growth."* Gompers v. United States, 1915, 233 U.S. 604, 610, 34 S.Ct. 693, 58 L.Ed. 1115. (Emphasis supplied.)

33. Justice Field, quoting with approval the words of James C. Carter, in his dissenting opinion in Brown v. Walker, 1896, 161 U.S. 591. 632, 16 S.Ct. 644, 653, 40 L. Ed. 819, 833.

tion to testify in their behalf.[34] To make the privilege against self-incrimination effective and to preserve the presumption of innocence, almost all of the states adopted laws forbidding comment on a defendant's neglect or refusal to testify and decreeing that no inference should be drawn from his silence.[35] In 1878 Congress adopted a statute allowing the defendant to testify in federal cases. The pertinent federal statute, 18 U.S.C.A. § 3481, on which the appellant relies in addition to relying on the Fifth Amendment, provides that "the person charged shall, at his own request, be a competent witness" and "[h]is failure to make such request shall not create any presumption against him".

It is worth noting that this statute, like the Fifth Amendment, does not speak in terms of "privilege". "Privilege" could connote a special benefit necessarily carrying a strict construction. The language is the language of rights and freedoms. The statutory option is not couched as a limitation on the prosecution. It carries no necessary implication that the absence of any presumption of guilt means no more than a ban against a prosecutor or trial judge drawing inferences of guilt and commenting on the inferences or presumptions silence might raise. Together, the constitutional grant and the statutory option seem to give an accused in a criminal trial an absolute right to silence, should he exercise the option, carrying complete freedom from adverse comment and from harmful presumptions (and inferences) based on assertion of the right.

Even in situations not involving criminal proceedings, the Supreme Court has observed that the "privilege against self-incrimination would be reduced to a hollow mockery if its exercise could be taken as equivalent either to a confession of guilt or a conclusive presumption of perjury". Justice Clark, in Slochower v. Board of Higher Education, 1956, 350 U.S. 551, 557, 76 S.Ct. 637, 100 L.Ed. 692. In Grunewald v. United States, 1957, 353 U.S. 391, 421, 77 S.Ct. 963, 1 L.Ed.2d 931 Justice Harlan, for the majority of the Court, pointed out that "recent re-examination of the history and meaning of the Fifth Amendment has emphasized anew that one of the basic functions of the privilege" is "to protect 'the innocent who otherwise might be ensnared by ambiguous circumstances' (Slochower)". Concurring, Justice Black said:

"[There are] no special circumstances that would justify use of a constitutional privilege to discredit or convict a person who asserts it. The value of these constitutional privileges is largely destroyed if persons can be penalized for relying on them."

A fortiori, a defendant in a criminal case, accorded the benefit of the presumption of innocence, should not be penalized for relying on a constitutional right.[36]

---

34. In the common law the accused could not be required by the Government to testify and as an interested party he was incompetent to testify in his own behalf. In 1864 Maine enacted a statute which simply provided that the accused might testify at his own request but not otherwise. This law was followed word for word by California in April 1866 and its substance by South Carolina in 1866. In May of 1866 Massachusetts enacted a statute similar to Maine but with the proviso "nor shall the neglect or refusal to testify create any presumption against the defendant." All of the states except Georgia by statute now give an accused the option to testify. The statutes are set out in 8 Wigmore, Evidence, § 2272, n. 2. (McNaughton rev. 1961).

35. By statute or by judicial decision all but six of the states have adopted the rule that the defendant's failure to take the stand does not give rise to an inference or presumption against him nor can it be the subject of comment by court or counsel. The six states which allow comment are: California, Connecticut, Iowa, New Jersey, Ohio, and Vermont. For list of statutes see Wigmore, ibid.; Reeder, Failure of Accused to Testify, 31 Mich. 40, 43 (1931).

36. "No inferences of guilt can be drawn from the failure of a defendant to testify for himself. Were it otherwise, a defendant on trial might be put in the awful situation of being required to com-

If comment on an accused's silence is improper for judge and prosecutor, it is because of the effect on the jury, not just because the comment comes from representatives of the State.[37] Indeed, the effect on the jury of comment by a co-defendant's attorney might be more harmful than if it comes from judge or prosecutor. A judge, in keeping with his high degree of responsibility to conduct a fair trial, would be expected to give a balanced, moderate explanation of the inferences to be drawn from silence. Similarly, but to a lesser degree, a prosecutor would be expected to recognize his responsibility for fair comment. But much less restraint can be expected from an attorney to whom no little latitude is allowed when zeal, emotion, eloquence, and the advocate's afflatus take hold of a jury argument.

Even if it were true that reasonable men cannot avoid drawing "natural inferences from an accused's silence," that is quite a different thing from having the silence emphasized by comment. The imputation of guilt from silence, if it does nothing else, may confuse the jury as to the presumption of innocence in favor of the accused.

Here it is by no means certain that the inference Gomez's attorney drew is warranted. De Luna was a Mexican national, in a strange city. He was surrounded by Gomez's family, who came to testify for Gomez. In the "ambiguous circumstances" of this case an innocent man, if he has language difficulties, if he is excessively nervous, if he is placed at a disadvantage as against his co-defendant, or if he has had a previous record of convictions or association with narcotics offenders, might very well decide that his appearance on the stand would subject him to a risk of being misunderstood or convicted of guilt by association, that

would be disproportionate to the advantage of testifying truthfully. He is entitled to make that choice.

IV.

We have found no case directly in point. Counsel for the United States referred us to Commonwealth v. Hassan, 1920, S.Jud.Ct.Mass., 235 Mass. 26, 126 N.E. 287. In that case the defendant was indicted with a co-defendant for murder. There was little, if any, doubt that the victim was killed by a revolver fired by one of the two defendants. The defendant who was convicted failed to explain the presence of cartridges in his shoes, a failure commented upon by the co-defendant's attorney in his argument to the jury. Counsel for the defendant presented a number of requests for instructions to the Clerk of Court but did not ask the Court to grant his requests until after the argument. One of these requested charges was that the defendant's failure to explain the cartridges could not be considered against him. The Supreme Judicial Court upheld the trial judge's ruling that the requests were not seasonably presented, because they were not presented before the argument. By way of dictum the court did say:

> "If this [reference by the co-defendant's attorney] was regarded as improper, the attention of the judge should have been called to it at once. * * * Moreover, no argument whatsoever was made upon the point by the district attorney or prosecuting officer, who alone is within the purview of the statute. It does not apply to arguments made in behalf of a codefendant." Commonwealth v. Hassan, 1920, 235 Mass. 26, 126 N.E. 287, 289.

A carefully considered opinion of the Supreme Judicial Court of Massachu-

---

mit perjury to avoid the consequences of his failure to avail himself of the privilege extended him by the statute. The statute might thus become an ingenuous machine to compel a conscientious defendant to testify against himself." Staples v. State, 89 Tenn. 231, 233, 14 S.W. 603 (1890).

37. For example, some courts (notably in Texas) hold that even the jury's discussion of the failure to testify is ground for reversal. Harrell v. State, 1931, 118 Tex.Cr.R. 279, 42 S.W.2d 438.

setts is entitled to great respect. But this statement is not necessary to the decision and in any event seems to rest on specific language of the Massachusetts statute, St.1912, c. 325, stating that refusal to testify shall not be made the subject of any comment by the prosecution or by the court.

Closer on principle—if distinguishable on the facts—are cases such as United States v. Housing Foundation, 3 Cir., 1949, 176 F.2d 665, holding that a defendant cannot compel a co-defendant to testify. Similarly, in State v. Medley, S.Ct.N.Car., 1919, 178 N.C. 710, 100 S.E. 591, the trial judge refused to allow a defendant to call a co-defendant to the stand when the facts showed that the evidence sought must prejudice the co-defendant's defense:

> " * * * it is very difficult to safeguard the constitutional guaranty of such a witness against self-incrimination, when the question of his own guilt is involved in the issue and before the same jury. * * * True, as appellant contends, it is ordinarily desirable that a witness be called to the stand, so that the court may more intelligently determine whether the questions and answers will trench upon his constitutional privilege; but on the facts of the present record, and considering the issue, the position of the parties concerning it, and the evidence as proposed, we are of opinion that the power of his honor in the premises has been providently exercised, and we approve his ruling in refusing to have the witness called to the stand and subjected to the proposed examination."

Compare State v. Gambino, La.Sup.Ct., 1952, 221 La. 1039, 61 So.2d 732, holding that a person jointly charged with a defendant *but not on trial with him* could be compelled to take the stand, since he could claim his privilege when asked a question requiring an incriminating answer.

Blair v. Commonwealth, 1936, 166 Va. 715, 185 S.E. 900, is another case which, on principle, supports this Court's holding. In that case the pressure to testify did not come from the trial judge or the prosecutor. Just as the jury was about to retire one of the jurors asked the court if the jury could have the benefit of the accused's testimony. Under this compulsion, the defendant's counsel then offered the accused as a witness. Notwithstanding the offer, which raised a question of waiver, the juror's inquiry was held ground for reversal.

Counsel for the appellee quotes from Knapp v. Schweitzer, 1958, 357 U.S. 371, 380, 78 S.Ct. 1302, 2 L.Ed.2d 1393: "It is plain that the amendment can no more be thought of as restricting action by the States than as restricting the conduct of private citizens. The sole—although deeply valuable—purpose of the Fifth Amendment privilege against self-incrimination is the security of the individual against the exertion of the power of the Federal Government to compel incriminating testimony with a view to enabling that same Government to convict a man out of his mouth." This general language merely states the principle that the Fifth Amendment is not applicable to state action, at least to a state court prosecution.

This proceeding is one in the federal courts. The Federal Government cannot wash its hands of responsibility for the compulsion to testify resulting from the court's inaction. The exclusive control of the conduct of the trial is in the hands of the presiding federal judge. He is "not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law." [38] He has the decisive role in assuring an accused a fair trial according to federal standards. "Federal judges are not referees at prize fights but functionaries of justice." [39]

---

38. Chief Justice Hughes in Quercia v. United States, 1933, 289 U.S. 466, 472, 53 S.Ct. 698, 77 L.Ed. 1321.

39. Justice Frankfurter in Johnson v. United States, 1947, 333 U.S. 46, 54, 68 S.Ct. 391, 92 L.Ed. 468.

In the recent case of Porter v. United States, 5 Cir., 1962, 298 F.2d 461, a post-conviction relief petition alleged inadequacy of representation in that the attorney for the defendant, who relied on the defense of entrapment, was also the attorney for one of the police officers who was involved in the entrapment. In reversing the district court's summary dismissal of the Section 2255 petition, this Court, through Judge Brown, reached conclusions similar to those we reach here:

"A Court may not countenance it and must, on the contrary, take effective action just as we are certain the careful Judge below would have done had the facts been known at or before the commencement of the criminal trial. But where this has been allowed to occur, either through a calloused conscience of the attorney, or ignorance of the true facts by the Judge, the trial is not the fair one demanded by the Constitution. *And this is so without regard to the presence or absence of any action of a strictly governmental nature which can be ascribed to the prosecution as the transgressing agency or imputed to the trial court on traditional notions of error on the Judge's part.*"

■ Here, to meet the requirements of a fair trial as embodied in the Fifth Amendment,[40] the trial judge must protect an accused's right of silence. The trial judge's approval of an improper comment or refusal to disapprove the comment and do whatever is necessary to protect a defendant from being pe-

nalized by relying on his constitutional right amounts, in our opinion, to sufficient participation in the comment or sanction of the comment so that it may be properly characterized as a violation of the Fifth Amendment and Section 3481. The narrow view advocated by the Government would lead to complete nullification of the constitutional right whenever one of several co-defendants (one of whom must be guilty) might seek to assert his right of silence. Mr. Justice Rutledge's comment on the privilege in 1938 rings true in 1962:

"With world events running as they have been, there is special reason at this time for not relaxing the old personal freedoms won, as this one was, through centuries of struggle. * * * There is in it the wisdom of centuries if not that of decades. Large in this is a sense of fairness to the person accused, a respect for his individual integrity, and accusation or even in guilt but larger still is the sense of the court's own part in justice and its administration." [41]

■ The court's instructions were intended, of course, to neutralize the effect of the comments. But considering the head-on collision between the two defendants, the repetition of the comments, and the extended colloquy over the comments between the trial judge and the lawyers, the imputation of guilt to de Luna was magnified to such an extent that it seems unrealistic to think any instruction to the jury could undo the prejudicial effects of the reference to de Luna's silence.[42] The seed of inference

40. The privilege against self-incrimination might seem to be an essential ingredient of a fair trial. As of this moment, however, Adamson v. California, 1947, 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903 and Twining v. New Jersey, 1908, 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97, foreclose the holding that the defendant's right of silence is essential to due process under the Fourteenth Amendment.

41. Wood v. United States, 1942, 75 U.S. App.D.C. 274, 128 F.2d 265, 278, 141 A.L.R. 1318.

42. Judge Learned Hand has said: "[This] recommendation to the jury * * * [is] a mental gymnastic which is beyond, not only their power, but anybody's". Nash v. United States, 2 Cir., 1932, 54 F.2d 1006, 1007. Mr. Justice Jackson goes as far: "[T]he naive assumption that prejudicial effects can be overcome by instructions to the jury * * *, all practicing lawyers know to be unmitigated fiction." Krulewitch v. United States, 1949, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790.

was so well planted, it is fair to assume that it germinated.

In short, for each of the defendants to see the face of Justice they must be tried separately.

## V.

■ The government's final argument is that the impropriety of the comments on de Luna's failure to testify was in any event harmless error. The Government maintains that the record in the instant case "shrieks of the guilt" of the appellant. Lutwak v. United States, 1953, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593; Thomas v. United States, 5 Cir., 1961, 287 F.2d 527, cert. denied, 366 U.S. 961, 81 S.Ct. 1923, 6 L.Ed.2d 1254; Fogarty v. United States, 5 Cir., 1959, 263 F.2d 201, cert. denied, 360 U. S. 919, 79 S.Ct. 1437, 3 L.Ed.2d 1534. The harmless error rule has restricted applicability in criminal cases. Since the defendant holds a carefully guarded right to have his guilt adjudged by the jury, an appellate court should be slow to assume that an error in the trial was inconsequential. In none of the cited cases did the Court base its decision squarely upon the harmless error doctrine. In Lutwak it was used merely to buttress the decision that the conviction should be affirmed after the Court already had found that there was no serious error in the trial proceedings. In Thomas and in Fogarty this Court referred to the strong evidence of guilt to support its decision not to take special notice of an alleged error in the trial that had not been properly preserved for appeal by timely objection. The instant case is quite different. The error was properly preserved for appeal, and in the circumstances of this case the error was serious.

The judgment against de Luna is reversed and remanded.

BELL, Circuit Judge (concurring specially).

With deference to the majority, I think this matter is controlled over-all by the right to a fair trial under the Sixth Amendment to the Constitution. The right of de Luna under the Fifth Amendment, and Title 18 U.S.C.A. § 3481, not to have the fact that he failed to testify commented upon is involved primarily. But the right of Gomez to take the stand under § 3481 and to a full and fair defense, and the right of the public to the enforcement of the criminal statutes are also involved. These rights must be balanced by the court whose duty it is to see that a fair trial is afforded while at the same time protecting all rights. And my disagreement with the majority centers around the scope of the right of Gomez.

It was proper in the defense of Gomez for his counsel to comment upon the fact that he had taken the stand, but it was improper for him to comment upon the fact that de Luna had not taken the stand. The inference which plainly would arise against de Luna by comments to the effect that Gomez testified, like the inference that arises in any event from the failure to testify, is one that must be checkmated by admonition of the court in charge. Cf. Bruno v. United States, 1939, 308 U.S. 287, 60 S. Ct. 198, 84 L.Ed. 257.

There is no authority whatever for the proposition that Gomez would in any wise have been deprived of a fair trial if the comments regarding the failure of de Luna to testify had not been made. He had no right to go that far. He did have the right to testify against de Luna as he did. Rickey v. United States, 5 Cir., 1957, 242 F.2d 583; Rowan v. United States, 5 Cir., 1922, 281 F. 137, cert. den., 260 U.S. 721, 43 S.Ct. 12, 67 L.Ed. 481. But no presumption or inference of guilt was permissible against de Luna from the fact that he did not testify. Bradford v. United States, 5 Cir., 1942, 130 F.2d 630, cert. den., 317 U.S. 683, 63 S.Ct. 205, 87 L.Ed. 547. All comment in the presence of the jury upon his omission to testify was forbidden. Wilson v. United States, 1893, 149 U.S. 60, 13 S.Ct. 765, 37 L.Ed. 650;

Stewart v. United States, 1961, 366 U.S. 1, 81 S.Ct. 941, 6 L.Ed.2d 84.

The charge of the court took care of the rights of both in the ordinary posture:

"The defendant Adolfo O. Gomez has taken the stand and testified in his own behalf in this case. A defendant cannot, in a criminal case, be compelled to take the witness stand and to testify. Whether he testifies or does not testify is a matter of his own choosing.

"When, however, a defendant elects to take the witness stand and testify, then you have no right to disregard his testimony because he is accused of a crime. When a defendant does testify, he at once becomes the same as any other witness, and his credibility is to be tested by and subjected to the same tests as are legally applied to any other witness.

"In determining the degree of credibility that should be accorded by you to the defendant's testimony, you are entitled to take into consideration the fact that he is the defendant and the very keen personal interest that he has in the result of your verdict.

"The defendant Carlos Garza de Luna has not testified in this case. You are instructed that under the law a defendant in a criminal case may take the stand and testify in his own behalf if he chooses, but the defendant is not required to testify, and you are charged that the failure of the defendant to take the stand in his own behalf in this case will not be considered by you as any evidence at all of his guilt as to the charge contained in the indictment in this case, and in your retirement you will not consider or refer to the fact that the defendant did not testify."

The opinion of the majority will create an intolerable procedural problem. If Gomez, or others similarly situated, claims the right which the majority holds that he has to comment on the failure of de Luna to testify, a mistrial will be required at the instance of his co-defendant who did not take the stand. In addition, severance in advance of trial may be required where there is a representation to the court that one co-defendant does not expect to take the stand while another or others do expect to testify, and claim their right to comment upon the failure of the other to testify. This would eliminate joint trials, or vest in a defendant the right to a mistrial during final arguments, or in the alternative create built-in reversible error, all in the discretion of the defendants. The law contemplates no such end.

The Sixth Amendment requires a fair trial. And the facts and circumstances as they arise must be considered. Here counsel for Gomez was allowed to comment, over objection made, on three occasions regarding the failure of de Luna to take the stand. The court overruled the objection on the ground that counsel for the co-defendant, as distinguished from the prosecution, could comment. This was error. When counsel for Gomez first alluded in argument to the fact that de Luna had not taken the stand, the objection should have been sustained, counsel admonished, and the jury instructed as to the rights of de Luna in the premises and to disregard the remark. This would have been the minimum corrective action to insure a fair trial to de Luna. Because it was not done, I join in the opinion of the majority to reverse. I do not agree that Gomez had the right to so comment.