**UNITED STATES of America**

v.

**Frank Joseph ROSA, a/k/a "Joe,"**
**et al., Defendants.**

**Crim. A. No. 75–80.**

United States District Court,
W. D. Pennsylvania.
Oct. 29, 1975.

James E. Roark, Asst. U. S. Atty., Pittsburgh, Pa., John W. Murtagh, Jr., Special Atty., U. S. Dept. of Justice, Pittsburgh, Pa., for plaintiff.

Harold Gondelman, Pittsburgh, Pa., for Rosa.

Thomas A. Livingston, Pittsburgh, Pa., for Sica.

Samuel J. Reich, Mark Glosser, Pittsburgh, Pa., for Mannella.

## MEMORANDUM and ORDER

McCUNE, District Judge.

In a two count indictment the United States charged defendants Frank Joseph Rosa, Joseph Sica and Vincent Mannella with violations of the federal conspiracy statute, 18 U.S.C. § 371 (Count 1) and the Hobbs Act, 18 U.S.C. § 1951 (Count 2). The conspiracy count was dismissed on motion of defendants during presentation of the government's case. Trial proceeded under the charge set forth in the second count of the indictment.

At trial, the government's chief witness was Joseph Vacarello, Jr., who was part owner of a family business which did landscape contracting work under the name Penn Landscape and Cement Work. Vacarello testified that on the morning of July 23, 1974, he received a phone call at his place of business from the office of Vincent Mannella requesting that he come up to Mannella's office, which was located nearby. Mannella, who was a business acquaintance of Vacarello, was the founder and president of Mannella Engineers, a private consulting engineering firm.

Vacarello testified that pursuant to the phone call, he went to Mannella's office where Mannella introduced him to defendants Rosa and Sica, who presented themselves as representatives of unnamed members of the Monroeville Borough Council. At the meeting Vacarello was asked if he had submitted a bid on behalf of Penn Landscape for the construction of a park in Monroeville Borough. When he acknowledged that he had, one of the defendants told him: "We would like to see you get the job but we would like a donation." Vacarello was not alarmed since this was not an unusual demand in his line of work. He was also told that he had a problem but he was not made aware of just what that problem was at the morning meeting. He was merely told that Mannella would contact him later that day.

According to Vacarello's testimony, he received a message from his answering service during the afternoon of the same day that Mannella had called. He returned the call whereupon Mannella requested him to come to his office again. Vacarello testified that he did so.

Upon his arrival, and while only he and Mannella were present, Vacarello testified that Mannella told him that the "donation" was to be $10,000.00. His testimony was that he was also told that if he refused to make the donation, he would not get the Overlook Park project on which he was low bidder, or any other work from the Borough of Monroeville. Vacarello also testified that he became aware of his "problem" at this afternoon meeting with Mannella when Mannella showed him a copy of the minutes of the Borough's Recreation Committee which indicated that he would not be awarded the Overlook Park project.

The jury convicted all three defendants.

Now before the court are post trial motions filed on behalf of defendants Rosa and Sica. Those motions are:

1. Motions in arrest of judgment under Rule 34, Fed.R.Crim.P., in support of which defendants advance two principal arguments, to wit,

(a) that Count II of the indictment fails to charge an indictable offense; and

(b) that the offense of which defendants stand convicted is not the offense charged in the indictment;

2. Motions for judgment of acquittal under Rule 29, Fed.R.Crim.P., in support of which defendants argue that the evidence is insufficient to sustain the convictions as a matter of law; and

3. In the alternative, motions for new trial under Rule 33 alleging trial errors, including, *inter alia*:

(a) denial of defendants' repeated motions for severance under Rule 14,

Fed.R.Crim.P., for relief from prejudicial joinder;

(b) the failure of the court to charge the jury as requested by defendants in certain of their points for charge;

(c) errors within the court's charge;

(d) error in admission of certain evidence; and

(e) failure to declare a mistrial after improper closing argument by the prosecution.

After careful consideration of the trial record, the briefs of counsel and the points raised at oral argument on the motions, it is the opinion of this court that all motions should be denied.

## I

### The Indictment

Count II of the indictment charges that defendants

"did unlawfully and willfully attempt to obstruct, delay and affect interstate commerce . . . by extortion as the term 'extortion' is defined in and by Section 1951, Title 18, United States Code; that is to say the said defendants did wrongfully and unlawfully attempt to obtain property of the value of $10,000 in the form of money from Joseph Vacarello, Jr. as agent and owner of the Penn Landscape and Cement Work with his consent induced by wrongful use of fear in that said defendants did threaten the said Penn Landscape and Cement Work and Joseph Vacarello, Jr., with loss of the 'Overlook Park' project and other contracts unless and until . . . Joseph Vacarello, Jr. paid the defendants the said amount of money."

For purposes of the motions now before the court, three aspects of the indictment bear emphasis. First, the indictment charges defendants with an unlawful attempt to obstruct commerce "by extortion as the term 'extortion' is defined in and by Section 1951," which is as follows:

"The term 'extortion' means the obtaining of property from another,

with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."

18 U.S.C. § 1951(b)(2). Secondly, when the indictment charges the wrongful use of fear, it is fear of economic loss, (see *United States v. Varlack*, 225 F.2d 665, 668 (2d Cir. 1955)), i. e., the loss of contracts, as opposed to fear of physical force or violence against either the intended victim or his property. Finally, it should be remembered that the indictment does not charge that commerce was affected by extortion; it does not charge that the extortion was completed or that commerce was affected in any way. It does not charge that money was actually obtained from the intended victim. What is charged is that defendants *attempted* to obtain money by instilling in the victim fear of economic loss if he refused to accede to the extortionate demand.

With this background, we now consider defendants' contentions *seriatim*.

## II

### The Hobbs Act

18 U.S.C. § 1951, the so-called Hobbs Act, provides:

"(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section [shall be guilty of an offense.]"

It is defendants' contention that while the above-quoted section clearly proscribes any attempt to obstruct, delay or affect commerce (as commerce is defined in the Act, § 1951(b)(3)) by extortion (as extortion is defined in the Act, § 1951(b)(2) *supra.*), the language of the Act does not make criminal an attempt to obstruct, delay or affect com-

merce by *attempted* extortion when there is no threat or use of physical violence and the indictment charges extortion of the type defined in the Act.[1] Stated otherwise, defendants argue that where, as here, the fear of economic loss is the only force or fear charged in the indictment, then in order for an offense to be made out, the attempted extortion must have been completed, i. e., the victim must have acceded to the unlawful demand.

## A. *Is 'Attempted Extortion' a Hobbs Act Offense?*

■■ Since there is no federal common law of crimes, federal criminal law is purely statutory. *United States v. Berrigan*, 482 F.2d 171, 185 (3rd Cir. 1973). Therefore, an attempt to commit a federal offense is itself an offense only when the section defining the offense specifically includes an attempt within its proscription. *United States v. Padilla*, 374 F.2d 782, 787, n. 7., (2nd Cir. 1967); *United States v. Joe*, 452 F.2d 653, 654 (10th Cir. 1972); see also Rule 31(c), Fed.R.Crim.P.

Defendants urge that the only crimes established by § 1951(a) are:

1. The obstruction, delay or affectation of commerce orthe movement of any article in commerce by

 (a) robbery, or

 (b) extortion;

2. The attempt "so to do;"

3. The conspiracy "so to do;" and

4. Committing or threatening physical violence to any person or poperty in furtherance of a plan to do anything in violation of § 1951.

■ They argue that the wording of the Act precludes an interpretation which would make it an offense to attempt to obstruct, delay or affect commerce by *attempted* extortion.

The premise for this claim is that the phrase *"attempts or conspires so to do"* as used in the Act refers to interference with commerce and not to the word, extortion. The identical argument was made in *United States v. Tropiano*, 418 F.2d 1069, 1082 (2d Cir. 1 6)w9ehre9 the appellants argued that "[T]he Hobbs Act requires proof of completed extortion and if construed to cover attempted extortion, is constitutionally void for vagueness." The Second Circuit rejected this argument:

> "The textual analysis of the statute would clearly embrace an attempt to conspiracy to interfere with commerce by extortion even though the attempt or conspiracy failed because the extortion was uncompleted. *United States v. Pranno*, 385 F.2d 387, 389–390 (7th Cir. 1967), cert. denied, 390 U.S. 944, 88 S.Ct. 1028, 19 L.Ed.2d 1132 (1968)."

418 F.2d at 1083.

Defendants have submitted a letter of three language experts which would support their grammatical argument. (See Exhibit "B" to Defendant Rosa's Brief). However, after consideration of the Act's legislative history, its construction by the judiciary in previous cases and the arguments presented here, we are convinced that it was clearly the intent of Congress to punish attempted extortion.

### 1. *Legislative History of* § 1951.

The present § 1951 is derived from the "Anti-Racketeering Act of 1934." *United States v. Varlack, supra*, at 671. Section 2 of the 1934 Act, 48 Stat. 979–980, provided:

> "Sec. 2. Any person who, in connection with or in relation to any act in any way or in any degree affecting trade or commerce or any article or commodity moving or about to move in trade or commerce—

---

1. Defendants distinguish between extortion as the term extortion is defined by § 1951(b)(2) and "what might be loosely referred to as another extortion provision,"

that is, committing or threatening physical violence to person or property in furtherance of a plan to do anything in violation of § 1951(a)." See Def. Rosa's Br., at 3.

(a) Obtains or *attempts to obtain,* by the use of or attempt to use or threat to use force, violence, or coercion, the payment of money or other valuable considerations . . . or

(b) Obtains the property of another, with this consent, induced by wrongful use of force or fear, or under color of official right; or

(d) Conspires or acts concertedly 0 . . to commit any of the foregoing acts; shall, upon conviction thereof, be guilty of a felony." (Emphasis added).

After the "restrictive"[2] decision of the Supreme Court in *United States v. Local* 807, 315 U.S. 521, 62 S.Ct. 642, 86 L.Ed. 1004 (1942), the statute was amended in 1946 to provide:

"Sec. 2. Whoever in any way or degree obstructs, delays, or affects commerce, or the movement of any article or commodity in commerce, by robbery or extortion, shall be guilty of a felony.

"Sec. 4. Whoever *attempts or participates in an attempt to do anything in violation of section* 2 shall be guilty of a felony." (Emphasis added).
60 Stat. 420.

In 1948 the Act was codified and assumed its present form, 62 Stat. 793 c. 645.

"Nothing in the legislative history of either the 1946 amendment or the 1948 codification indicates a congressional purpose to effect a change in the 1934 Act in so far as it was aimed at conspiracies to extort or rob or attempts to extort or rob which obstruct, delay or affect foreign or interstate commerce. Moreover, the reviser's notes to Title 18, § 1951 indicate quite clearly that the 'changes in phraseology and arrangement' were designed solely to effect consolidation,"
*United States v. Varlack, supra,* at 672.[3]

We believe that it is clear from § 1951's legislative history that Congress did not intend to eliminate an attempt to extort from the Act's prohibition. Defendants, citing numerous sections of Title 18, contend that Congress is aware of how to make an attempt a criminal offense which, they argue, was not done here. However, we believe that the present case is but another example of how draftsmen and revisers can create problems as to the meaning of a statute without busy legislators having any idea of what is occurring. See *United States v. Padilla, supra,* at 788 (J. Friendly, concurring).

Defendants seek to invoke the maxim that penal statutes should be strictly construed. However, as stated in *United States v. Padilla, supra,* at 787:

"But that canon 'is not an inexorable command to override common sense and evident statutory purpose,' *United States v. Brown,* 333 U.S. 18, 25 [68 S.Ct. 376, 380, 92 L.Ed. 442,] and does not 'require that the act be given the

---

**2.** In *United States v. Local* 807, *supra,* the Court declared that certain terrorist activities of various Teamsters Locals were excluded from the scope of the 1934 Act. Congress, evidently believing that the exemption given labor under the 1934 Act was too broad responded with the 1946 amendment which was designed to deter such labor practices. See *United States v Varlack, supra,* at 669; *United States v. Callanan,* 364 U.S. 587, 590–591, 81 S.Ct. 321, 5 L.Ed.2d 312 (1961).

**3.** The elimination of separate sections for conspiracies and attempts (§§ 3 and 4 of the 1946 Act) and their consolidation with section 2 to form § 1951(a) of the present Act was explained in H.R. 304 (80th Cong. 1st Sess.) (1947), at A131:

"The words 'attempts or conspires so to do' were substituted for sections 3 and 4 of the 1946 Act omitting as unnecessary the words 'participates in an attempt' and the words 'or acts in concert with another or with others' in view of Section 2 of the Title which makes any person who participates in an unlawful enterprise or aids or assists the principal offender, or does anything toward the accomplishment of the crime, a principal himself."
See also *Callanan v. United States,* 364 U.S. 587, 81 S.Ct. 321 (1961).

"narrowest meaning." It is sufficient if the words are given their fair meaning in accordance with the evident intent of Congress.'" *United States v. Cook,* 384 U.S. 257, 262–263, 86 S.Ct. 1412, 16 L.Ed.2d 516 (1966).

While we agree with the observation of Mr. Justice Stewart, in his dissent in *Callanan v. United States, supra,* at 598, 81 S.Ct. at 327 that "the relevant section of the Act (§ 1951) . . . is not a model of precise verbal structure," it is evident from the legislative history that it was the intent of Congress to forbid attempted extortion.

*2. Judicial Interpretation of the Hobbs Act.*

As previously mentioned the same argument presented by these defendants was made in *United States v. Tropiano, supra,* the Court, finding that the text of the statute "would clearly embrace an attempt . . . to interfere with commerce by extortion even though the attempt failed because the extortion was uncompleted."

Furthermore, in the recent case of *United States v. Starks,* 515 F.2d 112 (3rd Cir. 1975) the Third Circuit Court of Appeals stated:

> "The Hobbs Act proscribes a number of separate offenses: (1) robbery; (2) extortion; (3) attempted robbery or extortion; and (4) conspiracy to commit robbery or extortion."

515 F.2d at 116. See also *United States v. Jacobs,* 451 F.2d 530, 534 (5th Cir. 1971) *cert. denied,* 405 U.S. 955, 92 S.Ct. 1170, 31 L.Ed.2d 231 (1972).

Defendants, while conceding that the statement in *Starks,* if deemed controlling is fatal to their argument, contend that the above quoted statement is mere dicta since in *Starks,* the attempted extortion had reached fruition. Furthermore, defendants contend that neither the Fifth Circuit in *Jacobs* nor the Third Circuit in *Starks* has truly analyzed the Hobbs Act for the number of

crimes created since neither case proceeds to the substantive offense of committing or threatening physical violence to any person or property in furtherance of a plan to violate the Act. See Def.'s br. at 8.

Furthermore, defendants contend that the case at bar is distinguishable from cases cited by the government for the proposition that attempted extortion is a substantive offense. See e. g., *Hulahan v. United States,* 214 F.2d 441, 445, (8th Cir. 1954), *cert denied,* 348 U.S. 856, 75 S.Ct. 81, 99 L.Ed. 675 (1954); *Anderson v. United States,* 262 F.2d 764, 769–770 (8th Cir. 1959), *cert. denied,* 360 U.S. 929, 79 S.Ct. 1446, 3 L.Ed.2d 1543 (1959); *United States v. Green,* 246 F.2d 155 (7th Cir. 1957), *cert. denied,* 355 U.S. 871, 78 S.Ct. 122, 2 L.Ed.2d 76 (1957); *United States v. Mitchell,* 463 F.2d 187 (8th Cir. 1972); *United States v. Shackelford,* 494 F.2d 67 (9th Cir. 1974), *cert. denied,* 417 U.S. 934, 94 S.Ct. 2647, 41 L.Ed.2d 237 (1974); *United States v. Merry,* 514 F.2d 399 (8th Cir. 1975), and *United States v. Iozzi,* 420 F.2d 512 (4th Cir. 1970), *cert. denied,* 402 U.S. 943, 91 S.Ct. 1607, 29 L.Ed.2d 111 (1971).

Defendants argue that when the courts in the above cited cases refer to a prohibition against attempted extortion, they are not referring to extortion as defined by the Act, but rather to extortion within the substantive offense in the Act, to wit: "whoever . . . commits or threatens physical violence to any person or property . . . .," see n. 1 *supra.* Defendants argue that since the threat of physical violence is extortion within the Act, the substantive crime is committed by threatening physical violence. Defendants argue that the same is not true in cases of extortion as "defined by the Act" which they argue requires that the property be obtained in order to make out a substantive offense.

We find defendants' argument unpersuasive and hold that the prohibition

against attempted extortion applies to cases where extortion "as defined by the Act" is charged. In our view, to adopt defendants' technical argument would ignore the Congressional purpose discerned from the legislative history of the Act.

**B.** *Were Defendants Convicted of the Crime Charged by the Indictment?*

As a corollary to their principal argument that the Hobbs Act cannot be interpreted to proscribe attempted extortion, defendants argue that the crime of which they were convicted is not the crime charged in the indictment. The assertion is based on the language of the indictment which charges defendants with an attempt to obstruct, delay or affect commerce by extortion, as the term "extortion is defined in and by § 1951." Defendants argue that under the definition of extortion contained in § 1951(b)(2), the attempt to extort must have been completed. Having rejected defendants' argument that attempted extortion is not a Hobbs Act crime, *a fortiori*, we find no variance between the charge in the indictment and the charge of which defendants were convicted.

In short, we believe that defendants were tried only on charges set forth in the indictment as required by *Ex parte Bain*, 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887) and *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960).

### III

#### *Joinder*

Among the arguments raised by defendants in support of their respective motions for new trial, only one requires extensive discussion, i. e., whether it was error to deny defendants' repeated[4] motions to sever for relief from prejudi-

cial joinder. We conclude that it was not.

■ Defendants were properly joined in a single indictment since they were alleged to have participated in the same acts or transactions. *United States v. Starks, supra*, at 116. The question is whether they were properly tried together.

■ Primarily, for reasons of economy of time in judicial administration, the general rule has evolved that persons jointly indicted should be tried together. This rule has particular strength where, as here, one crime may be proved against two or more defendants on a single set of facts or the same evidence, *United States v. Shuford*, 454 F.2d 772, 775–776 (4th Cir. 1971), and a defendant is not entitled to a separate trial merely because it might offer him a better chance of acquittal. See *United States v. Wilson*, 140 U.S.App.D.C. 220, 434 F.2d 494, 501 (1970); 8 Moore's Federal Practice, § 14.04[1] at 14–14.2 —14–15. But notwithstanding the need for efficiency in judicial administration, a joint trial is inappropriate if it sacrifices a defendant's right to a fundamentally fair trial. *United States v. Shuford, supra*, at 776; *United States v. Echeles*, 352 F.2d 892, 896 (7th Cir. 1965).

■■ Whether or not a severance is to be granted is within the sound discretion of the trial court. *Opper v. United States*, 348 U.S. 84, 75 S.Ct. 158, 99 L. Ed. 101 (1954), *United States v. Stitt*, 380 F.Supp. 1172, 1176 (W.D.Pa.1974), and involves a balancing[5] of the interests of the public in avoiding a multiplicity of litigation and the interest of the defendants in obtaining a fair trial. 8 Moore's Federal Practice, 14.02[1], at

---

4. Defendants requested severance prior to trial, during the direct examination of government's principal witness twice (Tr. 144), during redirect examination of government's principal witness (Tr. 247, 264), at the conclusion of the government's case in chief (Tr. 277) and on four other occasions subsequent to having rested (Tr. 322, 323, 349, 363).

5. In *Byrd v. Wainwright*, 428 F.2d 1017 (5th Cir. 1970), the court offers guidelines for evaluating motions for severance based on a desire to offer exculpatory testimony of a co-defendant.

14–3. Furthermore, in cases of prejudicial joinder, defendant has the difficult burden of demonstrating that he is sufficiently prejudiced by the joinder to warrant severance. As we have said, the determination of the elusive criterion of prejudice rests within the judicial discretion at the trial level, see 8 Moore's Federal Practice, § 14.02[1], and requires a case-by-case determination. *United States v. Echeles, supra,* at 897.

In their post-trial motions defendants argue that the court abused its discretion in denying their motions to sever. First, defendant Rosa contends that a joint trial allowed prejudicial statements to be elicited by other counsel's examination of the principal government witness:

> "The prejudicial nature of joinder to this defendant is evident from the standpoint of the entire trial. For example, the limited cross-examination of the government witness conducted by counsel for Rosa was expanded by counsel for other defendants to the extent that the witness was finally able, on re-direct examination by the government, to state that he had prepared a written memorandum of the events occurring on July 23, 1974, for the reason that if he disappeared he would want someone to know what had occurred that day. All evidence of lack of fear had been explored and established by counsel for Rosa." (Def's Br. at 16–17).

Second, defendants argue that they were prejudiced by the comments of counsel for co-defendant Mannella to the effect that Mannella would take the stand and testify forthrightly and honestly. In their view, that statement necessarily alluded to the fact that both Rosa and Sica chose to rely on the presumption of innocence and elected not to testify.

Third, Rosa contends that his joint trial with defendants Mannella and Sica was inherently prejudicial because of antagonistic defenses.

Fourth, both defendants contend that they were denied a fair trial (a), by the court's refusal to allow the cases against them to go to the jury after the government rested and both Rosa and Sica had rested, but before Mannella presented his defense and (b), by the court's refusal to charge the jury, as requested, that they could not consider evidence which was presented during Mannella's defense in connection with the charges against Rosa and Sica. Defendants argue that these allegedly prejudicial errors could have been avoided by separate trials.

Fifth, defendant Sica contends that a severance was required when his counsel advised the court that co-defendant Rosa would provide exculpatory testimony on Sica's behalf if either Rosa or Sica were granted a severance, but that he refused to testify and relinquish his right to remain silent during the joint trial.

Finally, Sica contends that his constitutional rights to a fair trial, effective assistance of counsel, due process and compulsory process to secure witnesses in his behalf were abrogated by the court's denial of his motions to sever.

We will deal with each of these arguments *seriatim*:

 Defendant Rosa's first contention is that cross-examination of Vacarello by counsel for co-defendant Mannella opened the door for the government, on redirect, to elicit answers which would not have come out at a separate trial, and which were prejudicial to Rosa.[6] We find no merit in this argument. Whether or not Vacarello's statement that he prepared a written memo of the events which transpired on July 23, 1974, (the date of the meeting) so that in the event "[I] would end up missing I would have wanted that to be found . . ."[7] would have come out

---

6. See Transcript, 247–248.

7. Tr. 242–243.

at a separate trial is purely a matter of speculation. But even assuming that it would not have, its admission was not so prejudicial as to warrant a severance. The jury was instructed that defendants were not charged with any physical force or ·violence. Furthermore, the mere fact that a defendant would have a better chance of acquittal in a separate trial is immaterial. *United States v. Wilson, supra.* The test is whether "for each of the defendants to see the face of Justice they must be tried separately." *DeLuna v. United States,* 308 F.2d 140, 155 (5th Cir. 1962). In our view, the fact that the jury was permitted to consider all of the evidence against all of the defendants was entirely proper with the cautionary instruction that each of the defendants was to be separately considered.[8]

■ Defendants cite *DeLuna v. United States, supra,* for the proposition that comments by counsel for co-defendant Mannella to the effect that Mannella would testify forthrightly and honestly necessarily prejudiced Rosa and Sica who elected to remain silent as was their right, see *United States v. Housing Foundation,* 176 F.2d 665 (3rd Cir. 1949). In the *DeLuna* case, DeLuna and his cousin Gomez were charged jointly in a two-count indictment with receiving and facilitating the transportation and concealment of a narcotic drug and with purchasing and acquiring a narcotic drug. Like defendants here, both Gomez and DeLuna had their own attorneys and each attorney defended his own client as he saw fit without regard to the interest of the other defendants. At the trial, after Gomez's pretrial motion for severance had been denied, DeLuna did not testify. Gomez, however, did testify and blamed everything on DeLuna. According to Gomez he was an "innocent victim of circumstances."

"[H]is only connection with the narcotics was when he and deLuna were riding in Gomez's automobile; deLuna saw the police coming, tossed a package (the narcotics) to him and told him to throw it out of the window. The police saw Gomez throw the package." 308 F.2d, at 141–142.

In closing, counsel for Gomez made repeated comments on DeLuna's failure to testify which were strenuously objected to by counsel for DeLuna. Gomez was acquitted and DeLuna convicted. In reversing DeLuna's conviction the Court of Appeals for the Fifth Circuit held that a defendant's constitutionally guaranteed right to remain silent, free from prejudicial comment, applies to statements by a co-defendant's attorney as well as statements by the prosecution or the court. Furthermore, the court felt that instructions by the court that no inference of guilt could be drawn from a defendant's silence were inadequate to neutralize the effect of those comments:

"But considering the head-on collision between the two defendants, the repetition of the comments, and the extended colloquy over the comments between the trial judge and the lawyers, the imputation of guilt to deLuna was magnified to such an extent that it seems unrealistic to think any instruction to the jury could undo the prejudicial effects of the reference to deLuna's silence."

308 F.2d at 154. Therefore, the court held that if an attorney's duty to his client requires him to draw the jury's attention to a possible inference of guilt from a co-defendant's silence, the trial judge must order the defendants tried separately to avoid putting "Justice to the task of simultaneously facing in opposite directions." 308 F.2d at 143.

In our opinion *DeLuna* is not applicable to this case since there was no effort by counsel for Mannella to draw the jury's attention to a possible inference of guilt from the failure of either Rosa or Sica to testify. While *DeLuna* clear-

8. Tr. 389.

ly stands for the proposition that counsel for Mannella could have done so,[9] the fact is that he did not. Therefore, the statements complained of are, in the words of *United States v. Shuford, supra,* "an oblique reference to his failure to take the stand." 454 F.2d at 779. In *Shuford,* the court specifically rejected the argument of defendant that a statement of co-defendant's counsel, to wit: "Mr. Shuford answered questions in a direct, forthright manner without evasion" 454 F.2d at 779, was prejudicial to defendant. Because defendants here, like those in *Shuford* did not attempt to blame each other, we conclude that defendants suffered no prejudice from the comments complained of.

Furthermore, we agree with Judge Bell's concurring opinion in *DeLuna* where he says that if severance in advance of trial were required where there is a representation to the court that one co-defendant does not expect to take the stand while another or others do expect to testify,

> "This would eliminate joint trials, or vest in a defendant the right to a mistrial during final arguments, or in the alternative built-in reversible error, all in the discretion of the defendants. The law contemplates no such end." 308 F.2d at 156.

Finally in the court's charge, the jury was instructed:

> "The law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence and a defendant need not testify in his own defense and you may not draw any adverse inference from his failure to do so, that is, the defendant need not testify in his own defense and I repeat that you may not draw any adverse inference against him from his failure to testify." [10]

▮ Nor do we find that defendants' claim that joint trial was inherently prejudicial because of the antagonistic defenses of co-defendants has any merit.

> "If all that was necessary to avoid joint trial was a showing of prejudice, there would be few, if any, multi-defendant trials. This is because the very fact of joinder is prejudicial to one or more of the defendants. Thus, the following inherently prejudicial factors do not give rise to severance: that another defendant is charged with more serious offenses, that defenses of co-defendants are generally antagonistic . . ."

8 Moore's Federal Practice, § 14.04[1], at 14–14.1. However, even were we to assume that antagonistic defenses required a severance, see e. g., *DeLuna v. United States, supra,* the defenses in this case were not "antagonistic." See *United States v. Baggett,* 455 F.2d 476 (5th Cir. 1972). We have carefully reviewed the record and fully agree with the government's contention that the net effect of Mannella's testimony was to exculpate all three defendants.

In contrast to *DeLuna,* where the defenses were mutually exclusive, none of the defendants here sought to exculpate himself at a co-defendant's expense. See *Fields v. United States,* 370 F.2d 836 (4th Cir. 1967). We believe that the statement of the court in *United States v. Baggett, supra,* at 478, is also applicable here.

> "All three defendants were charged as to the same events . . . It would not be reasonable to require separate trials merely because the quality of the defense of each defendant might vary, if the defenses do not conflict."

▮ In answer to defendants' fourth argument we believe that both (1), the

---

9. Judge Bell, in a concurring opinion, argues that counsel should be limited in his comments to statements of the type made by counsel for Mannella here but should not be permitted to go so far as to infer a co-defendant's guilt from his silence. See 8 Moore's Federal Practice, § 14.04[3], at 14–40—14–48.

10. Tr. 368.

**614**

request to have the cases against Rosa and Sica submitted to the jury prior to Mannella's defense and (2), the request to instruct the jury that they could not consider the evidence presented in Mannella's defense in connection with the charges against Rosa and Sica were properly denied. In effect, the granting of either request would have amounted to a severance. The indictment in our view charged a joint attempt against all three defendants. It was, therefore, proper that the jury be permitted to consider all the evidence against each of the defendants. The fact that certain portions of Mannella's testimony may have corroborated the government's evidence is immaterial, *United States v. Wilson, supra*, at 501–502, especially in view of the fact that the net effect of his testimony in no way prejudiced the other defendants. The court also instructed the jury that "you should consider each of these defendants separately." [11] The trial strategy employed by counsel for Rosa and Sica whereby neither counsel participated in any cross-examination of defendant Mannella was just that, a trial strategy, and the defendants were not denied an opportunity to do so.

▇▇▇ Finally, we reject Sica's argument that a severance was necessary when his counsel advised the court that Rosa would testify on Sica's behalf if a severance were granted. Sica raised his contention that Rosa had testimony exculpatory as to Sica, which Rosa would be willing to testify to in a separate trial, after the United States had rested. The United States submits that raising the issue, after the government had rested its case in chief was untimely in view of the fact that Rosa was Sica's son-in-law and the five month interval between indictment and trial. However, since there is no evidence that Rosa's willingness to testify at a separate trial became known to Sica prior to that time, we believe it would be improper to base our ruling on that ground since the court has a continuing duty at all stages of the trial to grant a severance if prejudice should appear. *Schaffer v. United States*, 362 U.S. 511, 80 S.Ct. 945, 4 L. Ed.2d 921 (1960).

In support of his argument, defendant cites *United States v. Gleason*, 259 F. Supp. 282 (S.D.N.Y.1966), *United States v. Shuford*, 454 F.2d 772 (4th Cir. 1971) and *United States v. Echeles*, 352 F.2d 892 (7th Cir. 1965). In *Gleason*, after a pretrial hearing the court granted severance in an income tax evasion case when the moving defendant made a showing that he needed the evidence of a co-defendant to establish his defense of lack of guilty knowledge. In *Echeles*, the court reversed the conviction of an attorney for suborning perjury and impeding the administration of justice when it found that denial of defendant's motion for severance made him unable to call his co-defendant to the stand for the purpose of getting exculpatory statements into evidence which the co-defendant had made in open court:

"At this juncture, we hold merely that, having knowledge of Arrington's record testimony protesting Echeles' innocence, and considering the obvious importance of such testimony to *Echeles*, it is error to deny the motion for a separate trial."

352 F.2d at 898. In *Shuford*, the Court of Appeals for the Fourth Circuit held it was error to deny the appellant's motion for severance where "co-defendant had indicated to the trial judge that he would testify if granted a severance and had indicated the precise contents of the expected testimony and its importance."

Thus, in all three cases the defendant presented the trial court with strong reasons demonstrating his need for the testimony of a co-defendant.

▇▇▇ In this case, on the other hand, defendant Sica merely represented that Rosa would testify in a manner excul-

pating Sica if either were severed. In *United States v. Kahn*, 381 F.2d 824, 841 (7th Cir. 1967) the court stated:

"The unsupported possibility that such testimony might be forthcoming does not make the denial of a motion for severance erroneous."

Furthermore, the cases are consistent in their holding that a defendant must make a showing that the testimony would be exculpatory in effect. See, e. g., *Smith v. United States*, 385 F.2d 34, 38 (5th Cir. 1967), *Byrd v. Wainwright*, 428 F.2d 1017, 1020 (5th Cir. 1970), *United States v. Kaufman*, 291 F.Supp. 451 (S.D.N.Y.1968). That showing was not made here.

### IV

#### *Sufficiency of the Evidence*

█ In passing on the sufficiency of the evidence to support a verdict of guilty in a criminal case, the court must view the evidence and reasonable inferences that may be drawn therefrom in the light most favorable to the prosecution and determine as a question of law whether there is substantial evidence, either direct or circumstantial, to support the verdict. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. McClain*, 469 F.2d 68, 69 (3rd Cir. 1972).

In the charge to the jury the court stated that

"In order to convict Rosa of the charge of attempted extortion you must find beyond a reasonable doubt that:

A. He intentionally went to Mannella's office to participate with Mannella in a plan to obtain money from Vacarello by the use of threats, specifically, the threat to deprive Vacarello of the award of the Overlook contract or other contracts. No other offense is charged and no other offense may be considered by you.

B. That part of the plan was to be that Mannella was to be the spokesman for him (Rosa) in relating the amount of money to be paid and the threats allegedly stated. And that the second meeting occurred. And Mannella did demand the money and did make the threat.

C. That Rosa intended the threat to be real, that is, serious, and he intended that Vacarello would be frightened by the threat.

D. That Vacarello had a reasonable basis upon which to conclude that the defendants could have prevented him from getting the Overlook contract or other contracts from the Borough of Monroeville.

E. That Vacarello believed the threats, that is, that he was anxiously concerned by them.

F. That if the extortion had been carried out and the $10,000.00 paid, interstate commerce would have been affected." [12]

The court gave an almost identical charge as to what was necessary to convict defendant Sica. (Tr. 386–387). Also, the court gave a charge on aiding and abetting under 18 U.S.C. § 2.

█ Both Rosa and Sica now contend that the evidence was insufficient as a matter of law to permit a jury to find guilt under the court's charge. We disagree.

The government's principal witness, Joseph Vacarello, Jr., testified that he received a phone call on the morning of July 23, 1974, requesting that he come to Mannella's office, which he did. Upon his arrival, Mannella introduced him to defendants, Rosa and Sica. Following the introductions, Vacarello testified:

"A. . . . Mr. Manella said, 'Did you bid a job in Monroeville?' And I said, 'Yes, I did.' 'Well, Overlook Park?' And I said, 'Yes.' Then Mr. Sica said, 'We represent several councilmen from the Borough of Monroeville and you are a friend of Vince's

12. Tr. 384–385, 404–405.

and Vince is a friend of yours and we have a problem with the job and we would like to see you get the job but we would like a donation.'

Q. What did you say, sir?

A. I said, 'Okay, fine, depending on what you want.' " [13]

Vacarello said that at the time he had no idea what type of problem Sica was talking about nor what type of donation he was talking about. Later, Vacarello testified that he was told that Vince would call him later, after which he left Mannella's office. Later that same day, Vacarello testified that he received a phone message from his answering service that Mannella's office had called. According to his testimony, when Vacarello returned the call Mannella requested that he come up, which he did. Only he and Mannella were present at this second meeting.

"Q. What conversation, if any, took place at that time?

A. At that time Mr. Mannella told me what the amount of the donation was, or whatever it was.

Q. What amount did he specify?

A. $10,000.00.

Q. What did you say?

A. I was sort of shocked, I says, you know, no way, it is rediculous.

Q. What did he say?

"A. Well, I don't know, let me think a minute here—when he told me $10,000, I says, 'Christ, that is ridiculous, there is no way it could be paid on a job of this size' and I told Mr. Mannella, he is an engineer, I mean, he knows what things are. I said, 'Who the hell am I supposed to make this check to anyway?' Mr. Mannella said, 'We don't take

13. Tr. 64–65.

14. Tr. 72–73.

15. Tr. 78.

checks, it is cash in an envelope to me.'

Q. What did you say?

A. I said, 'There is no way that I would pay it.' " [14]

Upon being asked if Mannella told him why he had brought Vacarello and the other two defendants together, Vacarello answered:

"A. Mr. Mannella said that I was apparently angry. He said, 'Look, they are a friend of mine, you are a friend of mine. All I did here, all I am doing is getting you together.'"

\* \* \* \* \* \*

"Q. Did you still at this time, did you have any knowledge of what your problem was?

A. No, I did not.

Q. Did you find out at that meeting with Mr. Mannella what your alleged problem was?

A. Well, at that time at that second meeting, Mr. Mannella showed me the copy of the minutes of a Monroeville committee meeting." [15]

Those minutes rejected Vacarello's bid on the Overlook Park project and Vacarello testified that it was then that he realized what his "problem" was. When Vacarello said, "They do other work in Monroeville," Mannella responded, "Save your time, save your money," or something on that order. Vacarello then left Mannella's office.

The government submits that the evidence clearly established a common scheme, whereby the three defendants, designating Mannella as their spokesman and middleman, attempted to "shake down" Vacarello, and that despite the fact that only Mannella was present at the time of the attempt,[16] defendants Rosa and Sica were equally

16. The jury was instructed that there was no attempt at any extortion at the morning meeting of July 23, 1974, as a matter of law.

guilty because of their presence and participation at the earlier meeting.

As previously mentioned, the court instructed the jury under 18 U.S.C. § 2, the aiding and abetting statute. This was necessary inasmuch as the jury was instructed that there was no attempt to extort as a matter of law at the morning meeting. Since defendants Rosa and Sica were not actually present at the time of the attempt, they were necessarily convicted as aiders and abettors.

 In order to aid and abet another to commit a crime it is necessary that the defendant associate himself with the criminal enterprise, that he participate in it as something which he wishes to bring about and that he seeks by his action to make it succeed. *United States v. Barber*, 429 F.2d 1394, 1397 (3rd Cir. 1970), quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938), quoted with approval in *Nye & Nissen v. United States*, 336 U.S. 613, 619, 69 S.Ct. 766, 93 L.Ed. 919 (1949). Mere presence at the scene of a crime, even in the company of one or more of the principal wrongdoers, does not alone make one an "aider and abettor," unless the jury is convinced beyond a reasonable doubt that defendant was doing something to foreward the crime and that he was a participant rather than merely a knowing spectator. *United States v. King*, 402 F.2d 289, 291 (10th Cir. 1968); see *Hicks v. United States*, 150 U.S. 442, 14 S.Ct. 144, 37 L.Ed. 1137 (1893); *United States v. Barber, supra.* Stated otherwise, to convict a person of aiding and abetting, his conduct or other special circumstances attending his presence at a crime must be such as to show that he had associated himself with and participated in the criminal undertaking, and something of significance beyond his mere presence is necessary to justify conviction. *United States v. Barber, supra*, at 1397. In order to prevent onlookers from being convicted, the courts have responsibility to make sure that mere speculation is not permitted to substitute for proof of group activi-

ty in crime. *Cf. U. S. v. Barber, supra, Government of the Virgin Islands v. Navarro*, 513 F.2d 11 (3rd Cir. 1975).

 However, an act of relatively slight importance may warrant a jury's finding of participation in a crime. *United States v. Burrell*, 496 F. 2d 609, 610 (3rd Cir. 1974). Participation may also be shown by circumstantial evidence as well as by direct evidence, *United States v. Garguilo*, 310 F. 2d 249, 253 (2d Cir. 1962). In deciding whether circumstantial evidence supports a conviction the question is whether all the pieces of evidence against the defendant, taken together, make a strong enough case to let a jury find him guilty beyond a reasonable doubt. *United States v. Pratt*, 429 F.2d 690, 694 (3rd Cir. 1970).

 It is essential that the proof against each defendant must be individual and personal, *United States v. De-Cavalcante*, 440 F.2d 1264, 1275 (3rd Cir. 1971), *United States v. Klein*, 515 F.2d 751 (3rd Cir. 1975) and mere association with conspirators or knowledge of the illegal activity is not sufficient. *United States v. Prince*, 515 F.2d 564, 567 (5th Cir. 1975).

Since defendants Rosa and Sica were not convicted on the basis of their being present at the scene of the crime, (they were not present when the crime was committed) we must decide as to each whether there is evidence, either direct or circumstantial, to support the finding that each was guilty of aiding and abetting in the attempted extortion.

First, as to defendant Sica, the testimony is that Sica was the one who told Vacarello he had a problem and that "we" would like a donation. Furthermore, Sica told Vacarello that Mannella would call him later that day. Sica argues, and we agree, that in order for the conviction to stand it is necessary to infer that Sica appointed Mannella as his spokesman. Sica argues that the evidence was insufficient to go to a jury without accepting a theory of vicarious

liability for the phone call, and imputed authority to make the demands. While there is no direct evidence that either Rosa or Sica knew what Mannella was going to say, we believe that by his participation in the earlier meeting Sica *did* associate himself with the criminal enterprise. We believe that there is clearly evidence from Sica's statement that "Vince will call you" that he intended to associate himself with Mannella. We therefore, reject Sica's argument.

While the evidence against Rosa was not as strong as against the other defendants, it was sufficent to enable a reasonable man to conclude that Rosa was guilty of the offense charged beyond a reasonable doubt. In our view, Rosa's argument is fatally defective in its interpretation of the conclusions which the jury could draw from his presence in Mannella's office during the morning meeting.

Defendant Rosa's argument is that since Rosa did not say or do anything which instilled any fear in Vacarello and since Rosa never demanded or attempted to demand any money from Vacarello, his mere presence at the morning meeting is insufficient evidence as a matter of law of his participation in the attempt to extort. Further, Rosa contends that his presence in Mannella's office at the time of the meeting cannot support the jury verdict finding him guilty of elements "A" through "F" of the court's charge.

We disagree since we find that the jury could conclude on the basis of all the evidence that Rosa had associated himself with the extortion scheme and like Sica, had appointed Mannella as his spokesman. While the evidence of Rosa's participation is entirely circumstantial, it is sufficient to sustain the conviction.

## V

### *Other Claimed Errors*

We have carefully examined all other claims of error in defendants' motions and find them to be without merit. In our view, only one of those claimed errors requires discussion, i. e., whether the court committed prejudicial error in allowing Vacarello to testify as to a conversation which occurred subsequent to the attempt between himself and defendant Mannella wherein Mannella asked him: "Did you pay those fellows the $7,500 ?" [17]

Defendants, citing *Krulewitch v. United States,* 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 contend that the court erred in permitting Vacarello to testify to that conversation over defendants' objection. They contend that the conversation complained of amounted to a statement by an alleged co-conspirator after the conspiracy was at an end which *Krulewitch* held could not be used against the declarant's co-defendants. We disagree.

In the first place, the conspiracy charge was dismissed on defendant's motion prior to admission of the evidence now complained of. Furthermore, we do not believe that the statement is hearsay since it was not offered to prove the truth of the matter asserted, but rather to show Mannella's guilty knowledge of an attempt. Under the government's theory wherein Mannella was a spokesman for Rosa and Sica, the statement was likewise admissible against them. *Cf. Anderson v. United States,* 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974); *United States v. Lutwak,* 344 U.S. 604, 617–618, 73 S.Ct. 481, 97 L.Ed. 593 (1952).

In our judgment, the post trial motions should therefore be denied.

17. See Tr. 135–144.