464 A.2d 1270

COMMONWEALTH of Pennsylvania

v.

Nicholas KATSAFANAS, a/k/a Nick Perry.

COMMONWEALTH of Pennsylvania

v.

Edward PLEVEL.

Superior Court of Pennsylvania.

Argued Sept. 14, 1982.

Filed Aug. 5, 1983.

Petition for Allowance of Appeal Denied Dec. 8, 1983.

148

Thomas A. Livingston, Pittsburgh, for Katsafanas, appellant (at No. 103).

Thomas R. Ceraso, Greensburg, for Plevel, appellant (at No. 111).

James J. West, Assistant District Attorney, Harrisburg, and Henry G. Barr, Deputy District Attorney, for Commonwealth, appellee.

Before CAVANAUGH, BECK and MONTEMURO, JJ.

BECK, Judge:

Appellants Nicholas Katsafanas, a/k/a Nick Perry, and Edward Plevel, convicted of conspiracy[1], theft by deception[2], criminal mischief[3], rigging a publicly exhibited contest[4], and perjury[5] in connection with the Pennsylvania State Lottery fraud of 1980 bring this appeal from the denial of their post-trial motions for a new trial and in arrest of judgment. They raise ten issues in this appeal, of which the first poses a question of first impression: in what county or counties is it proper to try offenses in which a computer was essential to the furtherance of the criminal acts? Perry and Plevel claim that they were erroneously brought to trial in Dauphin County (the locus of the computer) because none of the manipulation of the lottery equipment used to select the winning numbers took place in Dauphin County.

Perry and Plevel's scheme to enrich themselves by the means of the computer-run state lottery was this: They first decided that the winning number combination (always one with three numerals) for the draw of April 24, 1980 would consist of only the numerals four (4) and six (6). There are eight possible three digit number combinations using only 4 or 6. The conspirators or their agents purchased lottery tickets for all the possible number combinations from retail ticket vendors at various locations. The rigging, or "fix", took place in the studio of WTAE in

1. 18 Pa.C.S. § 903.

2. 18 Pa.C.S. § 3922.

3. 18 Pa.C.S. § 3304.

4. 18 Pa.C.S. § 4109.

5. 18 Pa.C.S. § 4902.

Pittsburgh, Allegheny County, by means of placing counterfeit balls in the machines used in the drawing. When the winning number combination, 666, was drawn, Plevel telephoned Michael Keyser, an administrative officer in the Lottery Bureau in Harrisburg, Dauphin County. Keyser programmed 666 into the computer, and the conspirators or their agents subsequently cashed in their winning tickets.

This appeal, challenging the venue of a trial for crimes which made use of a computer-based operation, requires an examination of ancient rules of law in light of today's technology. The common law adopted a territorial theory as the basis of jurisdiction over crimes. Jurisdiction is concerned with the authority or power of a court to entertain a case. A state has the power to make certain conduct criminal if that conduct, or its results, occurs within the state's territorial limits. The rules of venue determine the place of trial within a jurisdiction. Issues relating to venue address the criteria for holding a trial in a particular court among several which may be jurisdictionally correct. The law relating to venue limits the general territorial rule by the concept that each crime has its own situs or locus which determines the correct place within the jurisdiction for the trial to take place.[6]

Two provisions of the United States Constitution govern the place of criminal trial. Article III section 2 requires that trials shall be held in the state where the crimes were committed, and the Sixth Amendment guarantees the accused "a speedy and public trial by an impartial jury of the state and district wherein the crime shall have been committed."

The Pennsylvania Constitution, Article 1, section 9 provides:

### Right of accused in criminal prosecutions

In all criminal prosecutions the accused hath a right to be heard by himself and his counsel, to demand the

6. LaFave and Scott, *Criminal Law* (1972), pp. 118 ff. *McGinley v. Scott,* 401 Pa. 310, 164 A.2d 424 (1960) has a good discussion of the distinction between jurisdiction and venue.

nature and cause of the accusation against him, to meet the witnesses face to face, to have compulsory process for obtaining witnesses in his favor, and, in prosecutions by indictment or information, a speedy public trial by an impartial jury of the vicinage; he cannot be compelled to give evidence against himself, nor can he be deprived of his life, liberty, or property, unless by the judgment of his peers or the law of the land.

This section of the Constitution of the Commonwealth, like the Sixth Amendment, relates to vicinage rater than venue; i.e. it guarantees the right to be tried by jurors summoned from the county where the crime occurred. The historical importance of venue (the place of the trial) and vicinage (the geographic origin of the jurors) is traced to the original function of the medieval juries, both the grand jury of presentment and the trial, or petit jury.[7] Medieval jurors' primary responsibility was to provide information about the accused and the crime based on their own knowledge. They served the function which is today served by witnesses. It was therefore important that jurors be local, so that the facts of the case would be ascertainable by the court. Even after the role of the jury changed from its early purpose to its modern one, listening to evidence presented and reaching a conclusion based on that evidence, the local quality of criminal justice remained important as an element in assuring a fair trial.

Prior to the American Revolution, the colonists cherished the principles of venue and vicinage to guard against transportation of criminal defendants out of the area to England or to some distant place for trial. Provisions guaranteeing local trials eventually became part of the constitutional provisions of the various states.

While these older concerns are no longer in issue, we still recognize the importance of venue in criminal procedure.

7. For the historical development of venue and vicinage see Kershen, Vicinage, 29 *Oklahoma L.Rev.*, 801 (1976) and 30 *Oklahoma L.Rev.* 1 (1977); Perkins, The Territorial Principle in Criminal Law, 22 *Hastings L., J.* 1155 (1971); Blume, The Place of Trial of Criminal Cases: Constitutional Vicinage and Venue, 43 *Michigan L.Rev.* 59 (1944).

The Third Circuit has recently reaffirmed its importance in *United States v. Passodelis,* 615 F.2d 975 (1980), which recognizes the public policy fostered by the rules of venue designed to protect the accused from being forced to stand trial far from home or far from the place where the crime was committed. Venue guarantees also safeguard criminal defendants from unfairness resulting from "forum shopping" by government prosecutors.

■ We turn now to the charges brought against Perry and Plevel, arising from transactions using computer terminals in various locations, resulting in criminal activity in several counties. When, as in the instant case, a presentment is returned by a multicounty investigating grand jury, the pertinent statutory authority is 42 Pa.C.S. § 4551(c)(d):

(c) **Prosecution by Attorney General.**—Whenever multicounty investigating grand jury returns a presentment against any person the Attorney General or his designee shall, with respect to the alleged criminal activities, be authorized to prosecute the person on behalf of the Commonwealth *by instituting criminal proceedings in the county of appropriate venue.* The Attorney General or his designee shall take the oath of office required by law to be taken of district attorneys, and shall be clothed with all the powers and subject to all the liabilities imposed upon district attorneys by law.

(d) **Venue.**—In any case where a multicounty investigating grand jury returns a presentment the supervising judge shall select the county for conducting the trial *from among those counties having jurisdiction.* (Emphasis added).

Perry and Plevel argue that the supervising judge's authority to select the county for trial in 4551(d) is limited to the counties of appropriate venue (c), and that Dauphin County is inappropriate because neither the crimes charged nor any of their essential acts were committed there. They claim that any connection between the crimes and Dauphin County was merely "incidental." We believe the connection between the criminal enterprise and Dauphin County was

more than "incidental," and we agree with trial court which found appellant's argument without merit.

We reject Perry and Plevel's position that the Commonwealth has failed to establish that any act that was a basis of the crimes charged took place in Dauphin County. Appellants are in error in maintaining that the sole connection with Dauphin County was a telephone call to Michael Keyser, pertinent to the conspiracy charge. Keyser was the "Daily Numbers Officer" in the Lottery Bureau, who was in charge of the administrative functions of the lottery. He monitored the drawing from headquarters in Harrisburg, maintaining direct contact with stations broadcasting the drawing by means of a conference telephone call (R. 259).

At trial, the operation of the computer-based lottery was explained by Donald Frank, director for administration of the Bureau of State Lotteries. He described the operation of the "Daily Numbers Game." Essentially, an on-line system connected the approximately 1400 ticket vending terminals to a central computer located in Harrisburg. When a wager was placed, all the wagering information was punched into one of the retail vending terminals located throughout the Commonwealth. The dollar amount of the bet, the number being bet, and the drawing date were punched into a terminal. An electronic message was transmitted to Harrisburg where the information was processed and stored. A return message was transmitted to the retail terminal which caused the terminal printer to issue a lottery ticket. The computer assigned each transaction an individual and unique control number, carried by no other ticket. The Harrisburg computer also recorded the exact time that each transaction occurred. After a studio draw, the winning number was telephoned to Harrisburg. Thereafter, when a winning ticket was presented to any one of the 1400 retail agents, the vendor sent an electronic message to Harrisburg where the computer researched the number and ordered the terminal at the agent's location to print a "pay" ticket (R. 88a–95a).

During Frank's testimony, the following exchange took place:

Q. Now, if for any reason the computer system in Harrisburg were not functioning, would it be possible for a retail vendor to sell a ticket to a customer?

A. No, Sir. (R. 94a).

Clearly, the functions of the Harrisburg computer were the essential operations in obtaining tickets and cashing them in. Every purchase of a ticket and every validation of a win occurred in and by the operation of the Harrisburg computer. The informations filed against Perry and Plevel charge them with purchasing lottery tickets and causing others to make purchases for them. Much more than the telephone call from Pittsburgh to Harrisburg was at stake, and the locus of the computer in Harrisburg makes Perry and Plevel's statement that Harrisburg was "incidental" to the crimes erroneous.

We are influenced in our analysis of proper venue in the case at bar by another case of first impression, *State ex rel. Meyer v. American Community Stores Corp.*, 193 Neb. 634, 228 N.W.2d 299 (1975)[8] which concerned the use of Electronic Funds Transfer Systems (EFTS). Computer terminals installed in retail stores performed services such as depositing and withdrawing funds and cashing checks for the convenience of the stores' customers. The question for the court was whether the stores were engaged in unauthorized branch banking operations, and the Nebraska Supreme Court held that they were not. The stores' EFTS were merely intermediaries between the customers in the store and the bank itself, where the central computer was located. All banking operations took place at the bank, not

**8.** This case has received some scholarly attention, although it has not been cited in other jurisdictions. See McDaniel, Banking—Computer Transfer by Retail store, 73 A.L.R.3d 1275, and Odorizzi, Customer-Bank Communication Terminals and the McFadden Act Definition of a "Branch Bank", 42 *U.Chi.L.R.* 362 (1975). The latter article discusses a ruling of James E. Smith, Comptroller of the Currency in 1974, that under 12 U.S.C. 36(f) (the "McFadden Act") computer terminals are not "branches" of a bank and that all transactions by the use of terminals *legally* occur at the banking house.

at the sites of the EFTS. Rejecting a claim of the state that American Community Stores were engaged in banking, the Nebraska Court held that to take the prosecution's approach was "to disregard ... the facts of electronic technology" (at 302). In the instant case, the computer in Harrisburg was central and essential to the operation of the lottery. Like the central bank's computer in *Meyer*, it was the mechanism without which the lottery operation could not function.

In *Meyer*, venue was not in issue. The question for the court was the place of the banking operations, not the place of trial. We do not read that case to mean that the place of the central bank computer would be the only place where a trial relating to the operation of the system could take place. In the instant case we do not hold that Dauphin county, essential as the computer was to the lottery operations, is the only county where venue could lie.

Another case which influences our view of the question is *United States v. Seidlitz*, 589 F.2d 152 (4th Cir.1978), cert. denied 441 U.S. 922, 99 S.Ct. 2030, 60 L.Ed.2d 395 (1979). Seidlitz was convicted of fraud by wire in violation of 18 U.S.C. § 1343. He had been a project director at a computer facility in Rockville, Maryland which performed services for the Federal Energy Administration. Seidlitz subsequently left that post and established his own computer firm in Alexandria, Virginia. He maintained contact with the Rockville computer illegally, using code words he knew from his former employment. Ultimately he was brought to trial in the United States District Court for the District of Maryland, although he himself was in Alexandria when he performed the criminal acts, and had fraudulently taken information from the computer by using the telephone. The court reasoned that Seidlitz's telephonic signals to the computer were acts of intruding and trespassing upon physical property, "as if he had broken into the Rockville facility and instructed the computer from one of the terminals directly wired to the machines" (at 160).

■ Thus, venue may lie at the location of the central computer, whether the crime involved direct manipulation of the computer itself, as in *Seidlitz*, or whether the crime involved use of the central computer as an essential part of the plan or scheme giving rise to the criminal activities as in the instant case.

■ We find ample reason for concluding that acts of crime occurred in Dauphin County, where the number 666 was programmed into the state computer and where all the computer-based data relating to purchases, odds, and authorization of payments originated. In the lottery fraud, criminal activity occurred in numerous places throughout the state. Essential to the entire operation was the functioning of the computer in Dauphin County. Since we regard appellants' argument that only the conspiracy charge and only the telephone call to Keyser in Harrisburg have any relationship to Dauphin County as specious, we find it unnecessary to respond to their contention that all of the offenses charged against Perry and Plevel have been "piggy-backed" onto that single event. If the computer is essential to and part and parcel of the crime, then the locus of the computer is one of the places where venue lies. We therefore hold that venue in Dauphin County was correct for the charges of conspiracy, theft by deception, criminal mischief and rigging a publicly exhibited contest.

■ We turn now to the perjury count relating to the testimony of Perry and Plevel at the grand jury in Philadelphia. The substance of the testimony concerned the charges in the other counts. If venue was proper in the other charges, as we hold that it was, the perjury committed before the grand jury was so intertwined with the other offenses as to require joinder. As the lower court points out, any connection between Philadelphia and the perjured testimony occurred because of the fortuitous choice of the situs of the grand jury, which by virtue of 42 Pa.C.S. 4541 *et seq.*, has statewide jurisdiction to facilitate the investigation of complex, multicounty crime. In view of the statewide effect of the lottery fraud, the close connection be-

tween the perjury and the other acts charged, and judicial economy, we hold that venue in Dauphin County was correct for the perjury charge as well, and the claim of error on this issue fails.

The second issue which we consider is whether the trial court erred in refusing to grant severance to Perry and Plevel. Both men were charged with conspiracy, rigging a publicly exhibited contest, theft by deception, criminal mischief and perjury.[9] All of the charges related to the episode of the April 24, 1980 manipulation of the lottery.

Severance is discretionary and the decision of the trial court will be reversed only upon a showing of manifest abuse of discretion or a showing of substantial prejudice and clear injustice to the accused. *Commonwealth v. Rose,* 265 Pa.Super. 159, 401 A.2d 1148 (1979). Perry claims that he was substantially prejudiced by the admission of testimony establishing that two men, one a business associate and one a friend of Plevel, purchased winning lottery tickets. He also claims that evidence of Plevel's perjury was prejudicial to him (R. 924a–931a). Plevel claims prejudice from the admission of statements made by Perry to other conspirators (R. 611a–613a, 631a–632a). Although Perry and Plevel played different roles in the lottery fraud, with Perry's function that of the studio announcer and Plevel's function that of the state officer in the Lottery Bureau, the criminal enterprise was identical. Each man relied on assistance from the other in plotting and perpetrating the fraud, and each made use of the assistance of other co-conspirators.

■ The standard for determining joinder was explained in *Commonwealth v. Rose, supra.* Generally, joinder is proper when crimes arise from a single fact pattern; the likelihood of confusion or prejudice in the minds of the jury is outweighed by considerations of expediency and judicial economy; and evidence relevant to the crimes of one defendant is admissible in the trial of the other (as tending to

9. Plevel was also charged with unsworn falsification to authorities, and acquitted. Perry, but not Plevel, was charged with participation in a rigged public exhibit, 18 Pa.C.S. 4109(c).

158

prove "motive, intent, absence of mistake or accident, a common scheme, plan, or design embracing the commission of two or more crimes so related to each other that proof of one tends to prove the others." *Commonwealth v. Lasch*, 464 Pa. 573, 586, 347 A.2d 690, 696); *Commonwealth v. Morris*, 493 Pa. 164, 425 A.2d 715 (1981). The charges against Perry and Plevel meet the standard of proper joinder enunciated in these cases.

In addition to these general considerations, special arguments support the joinder of defendants in conspiracy and perjury charges. It is well established practice in a trial for conspiracy for co-conspirators to be tried together. *Commonwealth v. Schwartz*, 210 Pa.Super. 360, 233 A.2d 904 (1967), aff'd 432 Pa. 522, 248 A.2d 506, cert. denied 398 U.S. 957, 90 S.Ct. 2161, 26 L.Ed.2d 541 (1970). As to the perjury charge, defendants may be tried together. The standards for joinder are found in *Commonwealth v. Weitkamp*, 255 Pa.Super. 305, 386 A.2d 1014 (1970), petition for allowance of appeal denied. Joinder was upheld in that case because the appellants shared a common motive, the evidence of fact necessary to prove the falsity of their testimony came from a closely related group of witnesses, and the crimes charged grew out of the same acts. We believe the criteria of *Weitkamp* apply to Perry and Plevel.

In challenging a trial judge's discretionary ruling that severance will not be permitted, the appellant has the burden of showing that the trial judge exhibited a manifest abuse of discretion or that his decision created a clear injustice, i.e. substantial injustice resulted from the refusal to sever. The assertion of a better chance of acquittal if tried separately does not meet this burden. *Commonwealth v. Iacino*, 265 Pa.Super. 375, 401 A.2d 1355 (1979); *Commonwealth v. Shriner*, 232 Pa.Super. 306, 332 A.2d 501 (1974). The court correctly instructed the jury that testimony incriminating Plevel was to be used only against him, without drawing inference against the other defendant, and vice versa (R. 729a, 1014a–1015a, 1059a–1060a). Our review of the record reveals no substantial prejudice to

either Perry or Plevel from the joinder. Accordingly, we find no abuse of discretion on this issue.

Perry also claims error in the court's charge. First, he claims it was error for the court to have made reference to Frank's testimony regarding the operation of the computer, and also it was error for the court to have read a section of the statute on criminal mischief. Perry argues that these segments of the charge violate the constitutional protection guaranteed by *Ex Parte Bain*, 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887) and *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960) which forbid broadening, variation or expansion of an indictment or information on the part of the trial court. We find this contention totally devoid of merit.

The court gave Perry's requested point for charge on the conspiracy count in the wording that Perry requested (R. 1001a), and added a reference to Frank's testimony because it was relevant to the Commonwealth's position regarding venue in Dauphin County, discussed above, pp. 4 *et seq.*

In no way did the court expand or change the substance of the information, and the challenged passages bear no discernible relationship to the issue in *Stirone* (in which the court's charge added an element not contained in the indictment) or *Bain* (where the court ordered some specific words stricken from the indictment in order to allow conviction without proof of those particular allegations).

Perry cites no case which supports his position that it is error to read a section of a statute when the accused is on trial for violating that statute. The court explained that it was reading part, rather than all of the statute on criminal mischief for purposes of clarity (R. 1052a). The statute itself is named in Perry's information. We find this claim completely lacking in merit.

Perry also claims that the trial court erroneously refused to give a requested charge relating to Plevel's testimony, which Perry characterizes as "significant excul-

patory testimony" (Appellant's brief, at 32). The requested charge was:

"2. I further charge you that, to the extent if any, you find the testimony of an accomplice tends to exculpate a defendant, that is, it tends to show the defendant to be not guilty, you may consider such testimony by an accomplice and find the defendant not guilty based on it. In other words, if you find that the testimony of Edward Plevel, an alleged accomplice, tends to show that Nick Perry was not involved in the crimes charged, you may find Mr. Perry not guilty based upon this testimony. This exculpatory testimony of an accomplice need only be proven by a fair preponderance of the evidence in order to raise a reasonable doubt.

I charge you that incriminating evidence must be proven beyond a reasonable doubt before you can convict a defendant. However, exculpatory evidence need only be proven by a fair preponderance of the evidence to raise a reasonable doubt and serve as a basis for a not guilty verdict." (R. 1083a)

Perry argues that refusal to give the requested charge violated the holding in *Cool v. United States*, 409 U.S. 100, 93 S.Ct. 354, 34 L.Ed.2d 335 (1972). In *Cool*, unlike the instant case, the defendant had relied on exculpatory testimony of an accomplice who admitted his own guilt. The trial court, over the defendant's objections, instructed the jury that the accomplice testimony should be disregarded unless the jury was convinced that it was true beyond a reasonable doubt. The Supreme Court found the challenged instruction unconstitutional. No such instruction was given in Perry and Plevel's trial, so there can be no violation of the *Cool* holding.

In this trial, Plevel's testimony regarding the activities of Perry was as follows:

Q. Would you tell us, sir, all that you know about Mr. Perry's involvement in the rigging of the Pennsylvania State Lottery on April 24, 1980?

A. I don't know any involvement.

Q. Will you tell us how you know about Nick Perry's role in any conspiracy with [co-conspirators] Mr. Maragos, Mr. Luman, Mr. Bock, or with yourself, with reference to the rigging of the Pennsylvania State Lottery on April 24, of 1980?

A. I don't know anything about it. (R. 936a).

The court gave instructions that four prosecution witnesses, who had admitted their part in the lottery fraud, were subject to the corrupt source criterion. The court also explained that all witnesses, including Plevel, were to be judged by credibility standards. The court repeatedly instructed the jury that the Commonwealth had the burden of proving the accused's guilt beyond a reasonable doubt. All these instructions were correct. *Commonwealth v. Jones,* 490 Pa. 599, 417 A.2d 201 (1980); *Commonwealth v. Cayton,* 300 Pa.Super. 417, 446 A.2d 924 (1982); *Commonwealth v. Fodero,* 273 Pa.Super. 278, 417 A.2d 648 (1979). Given the content of Plevel's testimony, the refusal to give additional special instructions on exculpatory accomplice testimony as to Plevel was not error. Rather than exculpate Perry, Plevel, in his testimony, stated he knew nothing about Perry's involvement.

■ The fifth issue on appeal is a claim of error in the trial court's denial of Perry's motion for a mistrial. The Commonwealth, in its closing argument, said of certain grand jury testimony of Perry and Plevel, "We know that was a lie" (R. 972a–973a). Since defense counsel did not request a transcript of the closing argument we cannot review the prosecution's statement in context. The judge who heard the closing argument stated, "In the Court's view, and the context in which it was presented, the Court does not view the comment as a personal opinion...." (R. 973a).

We find no abuse of discretion in the trial court's characterization of the remark. The prosecutor himself, after a side-bar conference, assured the jury that his remark reflected no personal opinion on his part (lower court opinion, 29). Perry's cited authority, *Commonwealth v. Potter,* 445

Pa. 284, 285 A.2d 492 (1971) states that where the District Attorney's language is intemperate or improper, a new trial is required. However, not every injudicious comment by a prosecutor necessitates a new trial.

> The language must be such that its "unavoidable effect would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant, so that they could not weigh the evidence and render a true verdict." *Commonwealth v. Simon,* 432 Pa. 386, 394, 248 A.2d 289, 292 (1968).

See also *Commonwealth v. Stoltzfus,* 462 Pa. 43, 337 A.2d 873 (1975). We conclude that the remarks here, with the accompanying admonition, do not constitute grounds to warrant a new trial.

■ Four claims of error relate to the conduct of the trial. Perry raises two. The first of these is a contention that Perry's counsel was improperly denied an opportunity to present rebuttal to the jury following the Commonwealth's closing argument. Although P.R.Crim.P. 1116(b) [10] clearly gives the Commonwealth the right to present the last argument, Perry argues that under Federal Rules of Criminal Procedure 29.1 [11] the defense is entitled to follow the prosecution and that without this procedural guarantee he was denied his Sixth Amendment right to effective assistance of counsel, as well as the Due Process and Equal Protection guarantees of the Fourteenth Amendment. His contention flies in the face of law and logic. *Commonwealth v. Toney,* 439 Pa. 173, 266 A.2d 732 (1970) and *Commonwealth v. Brown,* 470 Pa. 274, 368 A.2d 626 (1976)

**10. Rule 1116. Opening Statements and Closing Arguments**

. . . .

(b) When the evidence is concluded, each party shall be entitled to present one closing argument to the jury. Regardless of the number of defendants, and whether or not a defendant has presented a defense, the attorney for the Commonwealth shall be entitled to make one argument which shall be made last.

**11. Rule 29.1 Closing Argument**

"After the closing of evidence the prosecution shall open the argument. The defense shall be permitted to reply. The prosecution shall then be permitted to reply in rebuttal."

both uphold the constitutionality of Rule 1116, rejecting a challenge that it in effect shifts the burden of proof from the Commonwealth to the defense.

Perry claims that he needed an opportunity to respond to unanticipated Commonwealth closing arguments concerning the final drawing, two payoffs, and character testimony. Since the drawing and the payoffs were prominent in the testimony of Commonwealth witnesses, and the defense decided to put Plevel's character in issue, we conclude that closing arguments on these topics could not have been a surprise to the defense. We dismiss this claim of error.

■■■■ Perry's second claim of error relating to the conduct of the trial is that the defense's cross-examination of Commonwealth witness Peter Maragos, one of the conspirators, was improperly restricted. Ordinarily, cross-examination of witnesses is limited to matters brought out on direct examination, with the exception that questions outside the scope of direct are permitted to show bias on the part of the witness. *Commonwealth v. Cheatham,* 429 Pa. 198, 239 A.2d 293 (1968); *Commonwealth v. Ervin,* 262 Pa.Super. 322, 396 A.2d 776 (1978); *Commonwealth v. Dawson,* 486 Pa. 321, 405 A.2d 1230 (1979) (relying on *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 [1974]). Here the court prevented an attempt to elicit impeachment testimony in the form of questioning Maragos about failure to grant pre-trial interviews to the defense. Perry contends that the questions were necessary to prove bias on the part of Maragos.

Our standard of review of the scope of cross-examination is a determination of whether the trial court abused its discretion in its ruling. *Commonwealth v. Marker,* 231 Pa.Super. 471, 331 A.2d 883 (1974); *Commonwealth v. Lane,* 492 Pa. 544, 424 A.2d 1325 (1981). The record shows that both defense counsel were given extensive opportunity to cross-examine Maragos on his plea bargain with the Commonwealth, his possible animosity to those accused, and other matters relating to possible prejudice (R. 671a–691a). Perry has no claim that he was *denied* an opportunity to

elicit bias, as in *Ervin, supra,* and *Dawson, supra.* The lower court's determination that Maragos' refusal to grant a pre-trial interview to the defense was lacking in relevancy was not an abuse of discretion.

Plevel also presents charges of error in the conduct of the trial. The first relates to the denial of severance, discussed above, pp. 14 *et seq.* Plevel argues that after denying his request for severance, the court should not have refused his request to call Perry to the stand as a witness, nor refused to allow Plevel's counsel to address the jury on Perry's not testifying. Plevel's authority is *DeLuna v. United States,* 308 F.2d 140 (5th Cir.1962), *reh. denied* 324 F.2d 375 (5th Cir.1963) which, he maintains, protects his absolute right to draw the jury's attention to Perry's silence. We believe Plevel misinterprets *DeLuna.* In that case (in distinction to the instant one) two co-defendants presented mutually antagonistic defenses. One defense counsel commented on the other defendant's refusal to testify. The court thereupon ruled that under the factual circumstances and the nature of the defenses presented, the proper remedy was severance. In fact, the *DeLuna* court specifically upheld the accused's right of silence, and the obligation of the trial court, under the Fifth Amendment, to protect that silence from adverse comment. We do not read *DeLuna* to support Plevel's contention that he had a right to comment on Perry's refusal to take the stand.

*United States v. Addonizio,* 451 F.2d 49 (3rd Cir.1972) rejected the remedy of *DeLuna* and adopted an approach first enunciated in *United States v. Kahn,* 381 F.2d 824 (7th Cir.1967) on the need for severance when one defendant chooses not to testify:

> The question as we see it is how essential is it to a fair and complete defense, an attribute of a fair trial, that defendants be permitted to comment upon a co-defendant's exercise of his right against self-incrimination. The procedural difficulties and the complication of joint trials arising from the rule suggested by dicta in DeLuna are so great that we cannot say that there is an absolute right,

without reference to the circumstances of defense at trial, for a defendant to comment on the refusal of a co-defendant to testify. We think there must be more to justify the disintegration of a trial, such as a conspiracy trial, in which there is a cohesion of crime alleged, defendants charged, and proof adduced. There must be a showing that real prejudice will result from the defendant's inability to comment. (Emphasis supplied) (*Addonizio,* 451 F.2d at 63).

The *Addonizio* court held that the accused did not have a clear right either to severance or the right to comment on his co-defendant's silence, because Addonizio and his co-defendant had not presented mutually antagonistic defenses; i.e. the jury did not have the situation in which believing one defendant forced them to reject the defense of the other. Moreover, the court explained that the accused, while prevented from commenting on his co-defendant's silence, was free to comment at length on his own willingness to testify.

Plevel made no showing that he was prejudiced by Perry's silence, as required by The *Addonizio* rule. It is well established that Plevel could not compel Perry's testimony. The constitutional right of a defendant not to testify at the behest of a co-defendant remains his right even if the trials are severed. *United States v. Somers et al.,* 496 F.2d 723 (3d Cir.1974), cert. denied 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974); *United States v. Provenzano,* 688 F.2d 194 (3d Cir.1982). We therefore believe that the trial court was well within its discretion in refusing to allow Plevel to comment adversely on Perry's opting not to take the stand.

Plevel's final claim of error is that the Commonwealth was improperly allowed to cross-examine him on his knowledge of how many winning tickets had been purchased by Primo Pacy, a business partner and social friend (R. 924a) and about a ticket in the possession of another friend, Robert Santori (whose fingerprints had been found on a winning ticket) (R. 930a–932a). Plevel took the stand himself and offered a general denial of everything related to the lottery fix (R. 866a, 869a, 872–3a, 902a).

When a defendant chooses to take the stand, the scope of cross-examination in a criminal case is broad. *Commonwealth v. Williams*, 270 Pa.Super. 27, 410 A.2d 880 (1979), Petition for allowance of appeal denied, 1980; *Commonwealth v. Petrakovich*, 459 Pa. 511, 329 A.2d 844 (1974); *Commonwealth v. Dreibelbis*, 217 Pa.Super. 257, 269 A.2d 387 (1970) (on the wide latitude in cross-examination of accomplices). The law is clear that the trial court's ruling on the scope of cross-examination will not be overruled absent a showing of abuse of discretion, *Commonwealth v. Sisco*, 484 Pa. 85, 398 A.2d 955 (1979), and we conclude that once Plevel made a general denial of his participation in the fix the Commonwealth's questions on winning tickets held by Plevel's associates was admissible. There has been no showing of abuse of discretion on this issue.

██ Finally, Plevel maintains that he was convicted of perjury, theft by deception, criminal mischief, and rigging upon insufficient evidence. Appellate review of sufficiency of the evidence requires that this Court accept as true all the evidence upon which a trier of fact could properly reach its verdict, giving the Commonwealth the benefit of all reasonable inferences to be drawn from that evidence. We then ask whether these facts and inferences are sufficient to establish beyond a reasonable doubt that the accused was guilty of the crimes charged. *Commonwealth v. Madison*, 263 Pa.Super. 206, 397 A.2d 818 (1979). We agree with the trial court that the Commonwealth produced considerable and exhaustive evidence, including videotapes as well as witness testimony, of all the charges.

██ The "two witness rule" requires the testimony of at least two witnesses to establish perjury, in order to protect the one so charged from his own or another's good-faith mistake, as well as from harassment by a single grudge witness. *Commonwealth v. Broughton*, 257 Pa.Super. 369, 390 A.2d 1282 (1978). This requirement has been met. Plevel's perjury was established by the two senior citizens who participated in the April 24 telecast. Both refuted his sworn statement to the grand jury that a practice draw

occurred on that date after 6:30 P.M. (R. 207a–230a). Plevel's contention that he did not obtain any material benefit from the winning lottery tickets he held is belied by the testimony of Keyser, Dominic Marinucci, Kimberly Martin, and Peter Maragos, who together established that Plevel was active in the planning and perpetration of the scheme (R. 531a–540a; 560a–563a; 568a–570a; 631a–638a). Even if, *arguendo,* Plevel obtained no cash benefit from holding tickets with the winning combination 666 (a position which we find strains reasonable belief, since many of the tickets purchased for Plevel were redeemed, R. 590a–593a), he could still be found guilty of theft by deception. See *Commonwealth v. Posavek,* 278 Pa.Super. 265, 420 A.2d 532 (1980) upholding a conviction for theft by deception where the accused did not obtain property directly, but arranged to have it delivered to a third party.

 Plevel also argues that his activities do not fall within the reach of 18 Pa.C.S. § 4109(a) [12] because nothing was proved concerning his actual rigging of the lottery machinery. His physical absence from the machinery at a critical time when the lottery equipment was supposed to be guarded, leaving others free to insert and later destroy counterfeit balls, makes him as guilty as if he had himself performed one of those overt acts. Lottery regulations required Plevel's presence while the lottery machines were outside a locked closet where they were normally stored. His purposeful absence was therefore criminal. *Commonwealth v. Howard,* 265 Pa.Super. 535, 402 A.2d 674 (1979).

In conclusion, we hold that the jury reasonably found that the Commonwealth met its burden of proving all the ele-

---

12. § 4109. **Rigging publicly exhibited contest**
 (a) **Offense defined.**—A person commits a misdemeanor of the first degree if, with intent to prevent a publicly exhibited contest from being conducted in accordance with the rules and usages purporting to govern it, he:
 (1) confers or offers or agrees to confer any benefit upon, or threatens any injury to a participant, official or other person associated with the contest or exhibition; or
 (2) tampers with any person, animal or thing.

168

ments of the charges against Plevel beyond a reasonable doubt.

Judgment of sentence is affirmed.